IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 05-24 Erie |
| | ) | |
| BARRY WAYNE LEWIS | ) | |

**DEFENDANT BARRY WAYNE LEWIS' MOTION TO SUPPRESS
WITH CITATION TO AUTHORITIES**

AND NOW, comes the defendant, Barry Wayne Lewis, by his attorney, Thomas W. Patton,

Assistant Federal Public Defender, and respectfully moves the Court to suppress the rifle seized from

his person on March 28, 2005, and his statements to law enforcement following the seizure.    In

support thereof Counsel states:

**I. BACKGROUND**

Mr. Lewis is charged in a one count indictment with being a prohibited person in possession

of a firearm in violation of Title 18 U.S.C. § 922(g).  The charges arise from an unlawful seizure of

Mr. Lewis on March 28, 2005.  On that date, Mr. Lewis and his nephew Terry Sumrow were walking

west on 4th Avenue in Warren, Pennsylvania at about 10:00 p.m.  Warren County Deputy Sheriff

K.R. Sorensen was on patrol in Warren that night and saw Mr. Lewis and his nephew at the

intersection of 4th Avenue and Hickory Street.  On the 911 tape of Deputy Sorensen's call to the

dispatcher Deputy Sorensen informs the dispatcher that he is circling the block because he saw two

males walking west on 4th Avenue and one of the males "looked like he had a rifle or something

sticking out of a bag."  Deputy Sorensen circled the block, so that he was driving east on 4th Avenue

towards Mr. Lewis and Mr. Sumrow.  Deputy Sorensen activated his overhead lights and stopped

Mr. Lewis and Mr. Sumrow.

Deputy Sorensen approached Mr. Lewis, and discovered that Mr. Lewis was carrying rifle. Deputy Sorensen seized the rifle, a Marlin 30-30, and questioned Mr. Lewis about how he came into possession of the rifle. Mr. Lewis told Deputy Sorensen that he found the rifle while picking through trash and was taking the rifle to his sister's house where he was going to report his finding of the rifle to the police. Several City of Warren police officers, including Officer Brian Gulnac, arrived on the scene. Deputy Sorensen turned the rifle over to Officer Gulnac who confirmed the rifle was unloaded. Officer Gulnac also questioned Mr. Lewis about how Mr. Lewis came into possession of the rifle. Mr. Lewis told Officer Gulnac that he found the rifle while picking through trash. A warrant check revealed that Mr. Lewis had an outstanding warrant from California for being a parole violator. Mr. Lewis was arrested and taken to the City of Warren police station. At the station ATF Agent David Farabaugh questioned Mr. Lewis about the weapon. Mr. Lewis waived his Miranda rights and informed Agent Farabaugh that he had a history of mental illness and had recently returned to the Warren area from California because his father had recently died and his mother was suffering from advanced diabetes. Mr. Lewis again stated that he found the rifle while picking through trash and his intent was to take the rifle to his sister's house and have her call the police.

## II.  THERE WAS NO BASIS TO STOP MR. LEWIS

Deputy Sorensen had no basis to stop Mr. Lewis. At the time Deputy Sorensen seized Mr. Lewis the only information he had was that Mr. Lewis might be carrying a rifle. It is not illegal to carry on object that appears to be a rifle in public. Indeed, carrying an actual rifle in public in Pennsylvania is not *per se* illegal. 18 Pa.C.S.A. § 6106(a)(1). In the Commonwealth of Pennsylvania, if an individual has a permit to carry a concealed firearm, that individual commits no crime by carrying that firearm in public. 18 Pa.C.S.A. § 6109. In this case Deputy Sorensen, did not

even know if Mr. Lewis had a firearm but even if he did there was no basis to believe that Mr. Lewis was engaged in illegal activity by simply possessing a firearm.

The Third Circuit dealt with an almost identical situation in United States v. Ubiles, 224 F.3d 213, 217 (3rd Cir. 2000). In Ubiles an off-duty Virgin Islands Territorial Court Deputy Marshal was attending a large carnival on the Island of St. Thomas with some on-duty police officers. During the carnival a man who did not identify himself approached the Deputy Marshal and told him that there was a young man in the crowd who had a gun in his possession. Id. at 215. The tipster gave a description of the man with the gun including a description of the man's clothes. The police officers walked over to the young man and began talking to him. The defendant was not acting in a suspicious behavior, and the officers could not tell if he was armed. Id. The Deputy Marshal conducted a pat-down search of the defendant and discovered a machete and a .22 caliber pistol. The gun's serial number had been obliterated, and it was later learned that the gun was not registered. The defendant was charged with the federal offense of possession of a firearm with an obliterated serial number, and with the territorial offenses of possessing an unregistered firearm and escape. Id.

The defendant filed a motion to suppress the gun arguing that the police officers did not have a reasonable suspicion that he was engaged in illegal activity to justify the pat-down search. Id. The district court denied the motion to suppress, finding that the tip that the defendant had a gun provided reasonable suspicion to stop and frisk the defendant. The Third Circuit reversed.

The Third Circuit began its analysis by finding that "Deputy Marshal Leonard and his compeers had no reason to believe that [the defendant] was 'involved in criminal activity . . . .'" Id. at 217 (quoting Wardlow, 120 S.Ct. at 676). This was true because just as in Pennsylvania, "[i]t is not necessarily a crime to possess a firearm in the Virgin Islands, see V.I. code Ann. tit. 23, § 470

3

. . . .” <u>Id</u>. The court found that the government had not produced any evidence that Deputy Marshal Leonard or any of the other officers were aware of any articulable facts suggesting that the gun the defendant possessed was defaced or unlicensed, that the defendant posed a safety risk to the authorities or the carnival participants or that the defendant was acting in a manner indicating that he was involved in a different crime. As far as the police knew, the defendant was lawfully exercising his right under Virgin Islands law to possess a gun in public. <u>Id</u>. at 218.

In this case, Deputy Sorensen didn't even know if Mr. Lewis had a firearm at the time of the stop. But, even if Deputy Sorensen did determine Mr. Lewis had a rifle before the stop, just as in <u>Ubiles</u>, when Deputy Sorensen saw Mr. Lewis with the rifle as far as Deputy Sorensen knew Mr. Lewis was lawfully exercising his right under Pennsylvania law to possess a gun in public. The Pennsylvania statutes dealing with obtaining a license to carry and allowing the carrying of concealed weapons with a license are virtually identical to the Virgin Island statutes at issue in    <u>Ubiles</u>. <u>Compare</u> 18 Pa.C.S.A. §§ 6101(a)(1) and 6109 with V.I. Code Ann. tit. 23 §§ 2253(a) and 470. If the police in <u>Ubiles</u> did not have a reasonable suspicion to search the defendant based solely upon knowledge that he possessed a gun, then the police here did not have reasonable suspicion to stop Mr. Lewis based only on his observation that Mr. Lewis might be in possession of a gun.

It is important to note that while police observation of exclusively legal activity may lead to reasonable suspicion of criminal activity, the observed legal activity must point to the presence of illegal activity. <u>Ubiles</u>, 224 F.3d at 217. It is the lack of any evidence suggesting illegal activity that dooms the seizure in this case as it did in <u>Ubiles</u>. Furthermore, simply because this case involves a firearm does not mean any special law enforcement needs justify imposing a lower standard for establishing reasonable suspicion. There is no firearm exception to the Fourth Amendment <u>Florida</u>

4

v. J.L., 529 U.S. 266, 272, 120 S.Ct. 1375, 1379 (2000).  In a state in which the legislature allows citizens to lawfully carry weapons, observing a citizen carrying a weapon does not establish reasonable suspicion to believe that the citizen is committing a crime.

The government will undoubtedly attempt to rely upon the Third Circuit's ruling in United States v. Valentine, 232 F.3d 350 (3rd Cir. 2000), to argue that Ubiles is distinguishable, and that the stop in this case was reasonable so Mr. Lewis will deal with that argument here.  In Valentine two police officers were patrolling a high crime neighborhood in Irvington, New Jersey in a marked police car at 1:00 a.m.  Id. at 352.  The neighborhood was "very bad" with "[a] lot of shootings." Id.  As the officers were patrolling, a young man flagged them down and reported that he had just seen a man with a gun.  The informant gave a description of the armed man, and the officers immediately began looking for the armed man.  The officers spotted the armed man, who turned out to be Valentine, along with two other individuals in a parking lot about 100 feet away from where the informant had spoken to them.  When the officers pulled up and got out of their marked car, Valentine and his companions began to walk away.  Id. at 353.  The officers ordered the three men to stop.  Valentine then refused one of the officer's request to put his hands on the police car and tried to run.  Id.  The officers were able to stop Valentine and during the struggle a gun dropped from Valentine's person.

Relying upon Ubiles, Valentine argued that the gun should be suppressed.  The Third Circuit acknowledged that the tip that Valentine had a gun was insufficient, by itself, to justify the stop. However, the Third Circuit found that the tip that Valentine had a gun, coupled with his presence in a high crime neighborhood at 1:00 a.m., and his walking away from the police as they approached established reasonable suspicion of criminal activity justifying the officers' actions.  Id. at 357.

5

Valentine is of no help to the government here.  Mr. Lewis was not in a high crime area at the time of his stop, nor was it early in the morning when it was more likely that criminal activity was afoot.  United States v. Bouie, 2002 WL 467314, * 5 (E.D.Pa. 2002) ("While the stop was at night, it was only 9:51 p.m., a time when there would still be much legitimate activity on city streets.") Furthermore, Mr. Lewis did not walk away or flee from Deputy Sorensen.  Thus, none of the factors which coalesced to create reasonable suspicion in Valentine are present in this case.

One more issue must be clarified with regard to Valentine.  In its opinion, the Third Circuit found that since police officers can always approached citizens and engage in consensual conversation, and given that the rationale behind the Supreme Court's holding in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868 (1968), permitting frisks was to safeguard officers while they ask questions, a finding that there was not reasonable suspicion to stop and frisk Valentine, who they had reasonable suspicion to believe was armed, would have produced the inexplicable result that the officers could approach Valentine but not frisk him for their safety.  Valentine, 232 F.3d at 356-57.  This statement is *dicta*, and therefore not binding on this Court, and ignores the distinction between consensual versus non-consensual police conduct.

While it is true that police officers may always approached a citizen to engage in consensual conversation, Florida v. Bostick, 501 U.S. 429, 434, 111 S.Ct. 2382, 2386 (1991), if they chose to engage in this conduct they have no basis to employ their power as police officers to force the individual to speak with them or interact with them in any way, and they certainly have no right to frisk a citizen in such circumstances.  Id. at 2387 (citizens refusal to cooperate with law enforcement during consensual encounter "does not furnish the minimal level of objective justification needed for a detention or seizure").  In other words, when the police engage in consensual encounters, they

6

have no more authority during the encounter than a member of the general public. The police only obtain the power to frisk a citizen if there is reasonable suspicion to believe the citizen is engaged in or is about to engage in criminal conduct. The existence of reasonable suspicion triggers a police officer's ability to use his authority as a police officer to stop the citizen, and, for the police officer's safety, frisk the citizen.

In <u>Valentine</u>, the Third Circuit found reasonable suspicion for Valentine's stop so the issue of frisking was covered by <u>Terry</u>. However, to the extent the Third Circuit's *dicta* perceived some anomaly in the fact that a police officer could engage in a consensual encounter with someone the officer knew was armed, no anomaly exists. The Commonwealth of Pennsylvania has determined that its citizens may walk the public streets while armed. If a police officer wishes to engage such a law abiding citizen in a consensual conversation, the Fourth Amendment cannot be used to second guess the Pennsylvania Legislature's decision to allow its citizens the right to lawfully carry a firearm, which will inevitably lead to the situation in which the police may want to engage a lawfully armed citizen in a consensual conversation, and allow a frisk of that citizen because federal judges may think the situation dangerous. The answer to this perceived anomaly lies with the Pennsylvania Legislature and the citizens of the Commonwealth. If the citizens of the Commonwealth and the Legislature believe it is too dangerous to allow police officers to engage in consensual encounters with armed citizens, then the Legislature can change the law to prohibit the carrying of firearms by private citizens.

### III.  MR. LEWIS' STATEMENTS MUST BE SUPPRESSED AS FRUIT OF THE POISONOUS TREE

Since Mr. Lewis was seized in violation of his Fourth Amendment right to be free from

unreasonable searches and seizures, his statements to law enforcement officers following the illegal

seizure must be suppressed. Wong Sun v. United States, 371 U.S. 471 (1963). "The burden of

proving admissibility of a confession that follows from a Fourth Amendment violation rests with the

prosecution." United States v. Patino, 830 F.2d 1413, 1418 (7th Cir. 1987) (citations omitted);

Brown v. Illinois, 422 U.S. 590, 604 (1975).

It is important to note that the question is not limited to whether the statement was voluntary.

The Supreme Court has made this point emphatically.

> In Brown [v. Illinois, 422 U.S. 590 (1975)] and Dunaway [v. New York, 442
> U.S. 200 (1979)], this Court firmly established that the fact that the confession may
> be "voluntary" for purposes of the Fifth Amendment, in the sense that     Miranda
> warnings were given and understood, is not by itself sufficient to purge the taint of
> the illegal arrest. In this situation, a finding of "voluntariness" for purposes of the
> Fifth Amendment is merely a threshold requirement for Fourth Amendment Analysis.
> See Dunaway v. New York, supra, at 217, 99 S.Ct., at 2259. The reason for this
> approach is clear: "[t]he exclusionary rule, . . . when utilized to effectuate the Fourth
> Amendment, serves interests and policies that are distinct from those it serves under
> the Fifth" Amendment. Brown v. Illinois, 422 U.S., at 601, 95 S.Ct., at 2260. If
> Miranda warnings were viewed as a talisman that cured all Fourth Amendment
> violations, then the constitutional guarantee against unlawful searches and seizures
> would be reduced to a mere "'form of words.'" Id., at 603, 95 S.Ct., at 2261 (quoting
> Mapp v. Ohio, 367 U.S. 643, 648, 81 S.Ct. 1684, 1687, 6 L.Ed.2d 1081 (1961)).

Taylor v. Alabama, 547 U.S. 687, 690 (1982).

"In order for the causal chain, between the illegal arrest and the statements made subsequent

thereto, to be broken, Wong Sun requires not merely that the statement meet the Fifth Amendment

standard of voluntariness but that it be sufficiently an act of free will to purge the primary taint."

Brown v. Illinois, 422 U.S. 590, 602 (1975) (internal quotations omitted). To determine whether the

confession is obtained by exploitation of an illegal arrest, "[t]he temporal proximity of the arrest and

the confession, the presence of intervening circumstances, . . . and, particularly, the purpose and

flagrancy of the official misconduct are all relevant." Brown v. Illinois, 422 U.S. 590, 603-04 (1975) (footnotes omitted) (internal citations omitted).

Applying the Brown factors to this case reveals that Mr. Lewis' statements to Deputy Sorensen, Officer Gulnac and Agent Farabaugh were not sufficiently an act of free will to purge the primary taint of the illegal search and seizure. Mr. Lewis' statements to Deputy Sorensen and Officer Gulnac occurred minutes after the illegal seizure. There were no intervening circumstances. Indeed, not even Miranda warnings were given to Mr. Lewis. Finally, the purpose and flagrancy of the misconduct is apparent. Deputy Sorensen made a stop with no reasonable suspicion. After making the illegal seizure Deputy Sorensen, and Officer Gulnac engaged in custodial interrogation of Mr. Lewis without advising him of his Miranda rights to gather evidence to support a criminal charge. See Brown, 422 U.S. at 605 (arrest both in design and in execution was investigatory as police detectives testified that purpose of arrest was for investigation or for questioning).

Mr. Lewis' statement to Agent Farabaugh came within hours of Mr. Lewis' illegal seizure and followed his statements to Deputy Sorensen and Officer Gulnac. The Supreme Court has held that when a defendant has given one confession which is the fruit of an illegal search or seizure, a second confession which is substantially in accord with the first must be suppressed because the second confession is the result and fruit of the first confession. Brown v. Illinois, 422 U.S. 590, 605 n.12 (1975).

> The fact that Brown had made one statement, believed by him to be admissible, and his cooperation with the arresting and interrogating officers in the search for Claggett, with his anticipation of leniency, bolstered the pressures for him to give the second, or at least vitiated any incentive on his part to avoid self-incrimination.

Id; Patino, 830 F.2d at 1419 ("Here, as in Brown and Dunaway, the first confession was the product

of the Fourth Amendment violation, and it could be found that the taint caused the second confession because Patino thought she had already given the same information in an admissible confession.") This is true even if the first statement was made pursuant to a valid waiver of the defendant's Miranda rights.

There were no intervening circumstances whatsoever between Mr. Lewis' illegal seizure and Agent Farabaugh's questioning. While Agent Farabaugh did Mirandize Mr. Lewis, the Supreme Court has held that Mirandizing a citizen seized in violation of his Fourth Amendment rights does not purge the taint of the illegal seizure. Brown, 422 U.S. at 604. The purpose and flagrancy of the official misconduct is, again, apparent. Agent Farabaugh was following up on the illegal seizure and questioning of Mr. Lewis to gain evidence to support a federal charge of being a prohibited person in possession of a firearm. See Brown, 422 U.S. at 605 (arrest both in design and in execution was investigatory as police detectives testified that purpose of arrest was for investigation or for questioning).

## IV. MR. LEWIS' STATEMENTS TO DEPUTY SORENSEN AND OFFICER GULNAC WERE OBTAINED IN VIOLATION OF MIRANDA V. ARIZONA

Even if the Court finds the initial seizure of Mr. Lewis lawful, Deputy Sorensen's and Officer Gulnac's questioning of Mr. Lewis regarding how he came to possess the rifle must be suppressed as those statements were obtained in violation of Mr. Lewis' Miranda rights. Before a suspect may be subjected to custodial interrogation, law enforcement officers must first inform the suspect of his right to remain silent, the fact that if he chooses to speak his statements may be used against him during later proceedings, that the suspect has the right to have counsel present during questioning and if the suspect cannot afford counsel, counsel will be appointed at no cost to the suspect. Miranda v.

Arizona, 384 U.S. 436, 86 S.Ct. 1602 (1966). The determination of whether a suspect is "in custody" for purposes of Miranda is an objective one, focusing on "how a reasonable man in the suspect's position would have understood his situation." Berkemer v. McCarty, 468 U.S. 420, 422, 104 S.Ct. 3138 (1984). In Thompson v. Keohane, 516 U.S. 99, 116 S.Ct. 457 (1995), the Supreme Court explained the in custody test as follows:

> Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.

In this case, Mr. Lewis was forcibly seized by Deputy Sorensen and then interrogated by both Deputy Sorensen and Officer Gulnac. There were numerous police officers on the scene and Mr. Lewis was interrogated regarding his possession of a firearm and how he came into possession of the firearm. The firearm was taken from Mr. Lewis and he was held in custody pending a warrant check and ultimately handcuffed and arrested. These circumstances would lead any reasonable person to feel that he was not at liberty to terminate the interrogation and leave. Accordingly, Mr. Lewis was subjected to custodial interrogation without first receiving the warnings mandated by Miranda, and his statements to Deputy Sorensen and Officer Gulnac must be suppressed.

WHEREFORE, defendant, Barry Wayne Lewis, respectfully requests that this Honorable Court have a hearing on this motion and enter an Order suppressing the firearm found during the illegal seizure of Mr. Lewis and all statements obtained from Mr. Lewis as a result of the illegal seizure.

Respectfully submitted,

/s/ Thomas W. Patton
Thomas W. Patton
Assistant Federal Public Defender
PA I.D. No. 88653