IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

v.                    CRIMINAL NO. 05-24 ERIE

BARRY WAYNE LEWIS

SUPPRESSION HEARING

Proceedings held before the HONORABLE

SEAN J. McLAUGHLIN, U.S. District Judge,

in Courtroom C, U.S. Courthouse, Erie,

Pennsylvania, on Tuesday, October 25, 2005.

APPEARANCES:
         CHRISTINE A. SANNER, Assistant United States
         Attorney, appearing on behalf of the Government.

         THOMAS W. PATTON, Assistant Federal Public
         Defender, appearing on behalf of the Defendant.

Ronald J. Bench, RMR - Official Court Reporter

2

```
 1              I N D E X

 2

 3    WITNESSES:          DIRECT  CROSS  REDIRECT  RECROSS

 4  FOR THE GOVERNMENT:

 5  Keith Sorensen          4     15     38      --

 6  Brian Gulnac           42     54     70      --

 7

 8

 9

10              - - -

11

12

13    EXHIBITS:           IDENTIFIED     ADMITTED
```

14  FOR THE GOVERNMENT:

15  Government Exhibit No. 1          11          75

16

17

18  FOR THE DEFENSE:

19  Defendant Exhibit A              75          75

20

21

22

23

24                    - - -

25


                                    3


1                  P R O C E E D I N G S

2

3              (Whereupon, the proceedings began at 10:00 a.m., on

4  Tuesday, October 25, 2005, in Courtroom C.)

5

6              THE COURT:  This is the time we set for a

7  suppression hearing at Criminal No. 05-24.  Are we ready to go?

8          MS. SANNER:  We are, your Honor.

9          MR. PATTON:  We're ready, your Honor.

10         THE COURT:  Before we get going, let me just ask a

11    couple questions.  First, I read the papers here.  The

12    government's preliminary argument is, essentially, that the

13    reasonable suspicion analysis is unnecessary because it was a

14    consensual search.  When I read your papers, it wasn't clear to

15    me what your position was on that.  Are you conceding the

16    consensual nature of the stop?

17         MR. PATTON:  No, your Honor.  If you read our motion

18    to suppress, the motion to suppress argues as a ground for

19    suppression that there was not a reasonable suspicion to

20    justify a seizure, what we clearly believe is a seizure.  That

21    when a police officer pulls in front of you, activates his

22    lights, I feel comfortable arguing --

23         THE COURT:  You had to be otherwise it would make

24    the other argument moot.  You're suggesting there was no

25    consent, there was no reasonable suspicion, is that right?


4


1          MR. PATTON:  Correct.

2         THE COURT:  That's pretty much what I thought.  All

3  right, let's go.

4         MS. SANNER:  Your Honor, the government would

5  request sequestration of the witnesses.

6         MR. PATTON:  That's fine.

7         THE COURT:  All right.

8         MS. SANNER:  The government would first call Warren

9  County Deputy Sheriff Keith R. Sorensen.

10         THE COURT:  Okay.  Come on up here and give your

11  full name to my court reporter, spell it, and then my deputy

12  clerk will swear you in.

13         THE WITNESS:  Keith, K-e-i-t-h, R., Sorensen,

14  S-o-r-e-n-s-e-n.

15         KEITH SORENSEN, GOVERNMENT WITNESS, SWORN

16               DIRECT EXAMINATION

17  BY MS. SANNER:

18  Q.   Please state your full name for the record?

19  A.   Keith R. Sorensen.

20  Q.   And how are you employed?

21  A.   Deputy Sheriff for the Warren County Sheriff's Office.

22  Q.   How long have you worked with the Warren County Sheriff's

23  Office?

24  A.   I've been with the sheriff's office for 24 years.

25  Q.   What are some of the duties you have with the sheriff's

5

1  office?

2  A.   Criminal investigations, serving civil processes.

3  Protection from abuse orders, court security, warrants.

4  Q.   Were you on duty on March 28, 2005?

5  A.   Yes, I was.

6  Q.   What was your shift that day?

7  A.   Three to eleven.

8      THE COURT:  What time of day is that, is that 3 to

9  11 p.m.?

10     THE WITNESS:  I'm sorry, 3 to 11 p.m.

11  BY MS. SANNER:

12  Q.   Around 10 o'clock p.m. on March 28th, where were you?

13  A.   I just finished doing a security check on the Domestic

14  Relations building that is owned by Warren County, at Hickory

15  Street.

16  Q.   Were you in your patrol vehicle at that time?

17  A.   Yes, I was.

18  Q.   And where were you headed to?

19  A.   I was headed north on Hickory Street, and stopped at

20  Hickory and Fourth because of a red light.

21  Q.   It was 10 o'clock at night, it must have been dark?

22  A.   Yes, it was dark, there were streetlights, headlights for

23  illumination.

24  Q.   Did anything particular catch your attention at that

25  corner?


6


1  A.   Yes, as I was stopped facing north on Hickory Street, the

2  two subjects walked in front of my patrol vehicle.

3  Q.   So they crossed the street directly in front of your

4  patrol vehicle?

5  A.   They crossed the street directly in front of my patrol

6  vehicle, and they were headed west.

7  Q.   Did you notice anything in particular about the two men

8  passing in front of you?

9  A.   Yes, the subject furthest from my patrol vehicle appeared

10  to be carrying an item and trying to hide it from my view.

11  Q.   And what did that item appear to be?

12  A.   Right away I thought it appeared to be a rifle.

13  Q.   How big was it?

14  A.   It was about three-feet long I'm going to say.

15  Q.   And was it the size that made you think it was a rifle?

16  A.   Yes.

17  Q.   And you said he was trying to hide it from your view?

18  A.   It appeared as though he was trying to hide it from my

19  view by using the person that was beside him, to his left, and

20  between him and my patrol vehicle as a shield.

21  Q.   Was the rifle out in the open, was it wrapped in

22  anything?

23  A.   It was in a bag and wrapped in a sheet or blanket of some

24  sort.

25  Q.   And as he crossed the street in front of you, what can

7

1  you describe, anything unusual about his movements or how did

2  he move across the street?

3  A.   They moved across the street walking, but the person

4  carrying what I thought was a rifle appeared to have a

5  stiff-arm, meaning that his arms weren't moving in a natural

6   manner, swinging back and forth, it appeared to keep his arm

7   stiff to his side.

8   Q.    So his arms were in line with his body rather that

9   swinging?

10   A.    Yes.

11          THE COURT:  What did he keep stiff to his side?

12          THE WITNESS:  What I thought was the rifle.

13   BY MS. SANNER:

14   Q.    And did you follow their path as they continued across

15   the street?

16   A.    No, the light turned green, I proceeded north.  As I

17   proceeded north, I turned my head to the left where I could see

18   their backs, and again I could see the item, and again I

19   thought that it looks like a rifle.  So I proceeded around the

20   block and radioed the Warren City Police and advised them that

21   I thought I saw the subject carrying a rifle walking down the

22   street.  And I just thought it looked a little bit suspicious.

23          THE COURT:  Keep your voice up, you're trailing off.

24   BY MS. SANNER:

25   Q.    So you radioed for backup, essentially?

1   A.   Yes, I did.

2   Q.   And you didn't immediately pull over to stop the

3   subjects?

4   A.   No, I did not.

5   Q.   Instead, you continued through the intersection and then

6   proceeded around the block?

7   A.   Yes, I did.

8   Q.   There was a period of time where you would have lost

9   sight of the subjects?

10  A.   Yes, there was a short period of time.

11  Q.   You didn't immediately turn on your lights and siren and

12  pull them over?

13  A.   No, I did not.

14  Q.   After you proceeded around the block, did you again see

15  the two subjects?

16  A.   Yes.  Like I said, I radioed for the Warren City Police

17  and I proceeded down west on Fourth Avenue then, the direction

18  that I saw the subjects going last, and within a couple of

19  blocks I located the persons again.

20  Q.   How many minutes would have elapsed, would you have

21  guessed?

22  A.   I'm going to say maybe a couple minutes.

23  Q.   From when you first sighted them until you went around

24  the block and saw them again?

25  A.   Yes.


9


1  Q.   When you saw them again, did it still appear as though

2  the subjects had a rifle?

3  A.   Yes.

4  Q.   When you saw them again, how fast were you going?

5  A.   Just normal speed, maybe a little bit under the speed

6  limit.  Because I was looking and trying to drive safe and

7  looking at the same time for the persons.

8  Q.   When you drove around the block, were your emergency

9  lights on?

10  A.   No, they were not.

11  Q.   When you saw them and pulled over, did you turn your

12  emergency lights on?

13  A.   Yes, at this point I turned my emergency lights on, I was

14  kind of in the intersection, being nighttime I didn't want

15  someone to come through and hit us.  So I turned my lights on

16  as I exited my vehicle.

17  Q.   Can you describe your approach to the two subjects?

18  A.   Just a normal approach.  I got out of the vehicle and

19  asked the subjects what do you got in the bag.

20  Q.   And what happened?

21  A.   Mr. Lewis told me it's a rifle, I found it in the

22  garbage.

23  Q.   When you approached Mr. Lewis, did you have your weapon

24  drawn?

25  A.   No, I did not.


10


1  Q.   Did you show your badge?

2  A.   I was wearing a uniform.

3  Q.   Did you run across the street?

4  A.   No, I did not.

5  Q.   You just walked up to them and said hey, what do you

6  have?

7  A.   Yes.

8  Q.   Did he immediately hand you the rifle?

9   A.   Yes, he immediately handed it to me and stated he found

10   it in the garbage, it was a rifle.

11   Q.   And he offered the rifle to you?

12   A.   Yes.

13   Q.   Did you take the rifle?

14   A.   Yes.

15   Q.   Did you tell him that he was under arrest?

16   A.   No, I didn't have any reason to arrest him at that point.

17   Q.   Did you threaten him?

18   A.   No, I did not.

19   Q.   Did you try to control or block his movement when you

20   approached him?

21   A.   No, I did not.

22   Q.   And you didn't need to frisk him to take the rifle?

23   A.   No, he handed it to me.

24        MS. SANNER:  Your Honor, may I approach the witness

25   with the rifle?


11


1        THE COURT:  Yes, you can without asking permission.

2        MS. SANNER:  It's been made safe, your Honor.

3  BY MS. SANNER:

4  Q.   I'm showing you what's been marked as Government Exhibit

5  1, do you recognize it?

6  A.   It appears to be the rifle that Mr. Lewis gave me.

7  Q.   And does it appear to be in the same or substantially the

8  same condition as when you saw it last?

9  A.   Yes, it appears to be in good condition.

10        MS. SANNER:  May I ask the witness to step down.

11        THE COURT:  Sure.

12  BY MS. SANNER:

13  Q.   If you could just take a hold of the rifle and show the

14  court how Mr. Lewis was carrying it when you first observed

15  him?

16  A.   When I first observed him carrying the rifle --

17        THE COURT:  Not to interrupt you, officer, but as

18  you were in your patrol car sitting at the intersection, are

19  you saying he would have passed from your right to your left,

20  is that right?

21        THE WITNESS:  Yes, sir.

22        THE COURT:  If you could do the same thing in front

23  of me to be as accurate as possible.

24        THE WITNESS:  Okay.  You're my patrol vehicle where

file:///A|/LEWISSUP.TXT

25  I'm sitting.  Mr. Lewis was here, (indicating) --

12

1        THE COURT:  The record is not going to pick that up.

2        THE WITNESS:  Mr. Lewis was in front of me and

3  furthest away from my vehicle.  And he had another person with

4  him, that was between him and my patrol vehicle to his left.

5        THE COURT:  I'm not going to try to tell you how to

6  orchestrate this, we have another person, that is Ms. Sanner,

7  why don't you use her as a prop.

8        THE WITNESS:  I am Mr. Lewis, she is Mr. Sumrow.

9        THE COURT:  All right.

10        THE WITNESS:  Mr. Lewis had the gun in his left

11  hand, and at first I thought the gun was butt up.  But as he

12  handed it to me, it was he had been carrying it like the barrel

13  up.  So he was carrying the rifle and he had a stiff-arm in

14  walking, trying not to move the weapon at all and using Mr.

15  Sumrow as a shield to block my view of what he was carrying.

16        THE COURT:  All right.  Let the record reflect the

17  officer walked from right to left in front of me with the

18  weapon in his left arm against his body, with the muzzle

19  pointed up.  And Ms. Sanner was walking directly to his side

20  closest to me in lock step.  All right.

21  BY MS. SANNER:

22  Q.  When he turned the gun over to you, you were the only

23  officer on the scene?

24  A.  Yes, I was the only officer present at that time.

25  Q.  Did any other officers arrive?

13

1  A.  Officer Gulnac from the Warren City Police Department

2  arrived.

3  Q.  And did he arrive after Mr. Lewis handed the weapon over

4  to you?

5  A.  Yes, he did.

6  Q.  And when he arrived, what did you do with the weapon?

7  A.  I handed it to Officer Gulnac and told him that Mr. Lewis

8  stated he found the gun in the garbage down the street.

9  Q.  When Officer Gulnac arrived, was his gun drawn?

10  A.  No, it was not.

11  Q.  Did Mr. Lewis ever complain about the treatment he

12  received?

13  A.  No, not to me he didn't.

14  Q.  Did he say he had a permit to carry a rifle?

15  A.  No, he did not.

16  Q.  When Officer Gulnac arrived, did he then ask the

17  defendant who he was?

18  A.  Yes.  Officer Gulnac then took over the scene and he did

19  the questioning of Mr. Lewis.

20  Q.  Did Mr. Lewis have identification with him?

21  A.  No, he did not.

22  Q.  Did Officer Gulnac then check to see whether or not the

23  gun was stolen?

24  A.  Yes, Officer Gulnac called his station and they ran the

25  gun with the serial number, it came back I believe no record

14

1  found on the gun.

2  Q.  Did Mr. Lewis want the gun back?

3  A.  Yes.  Mr. Lewis stated that he found it in garbage, he

4  was going to turn it into the police.  If nobody came and

5  claimed it, he would like to have it back.

6  Q.  At that point the gun was secured by Officer Gulnac in

7   the patrol vehicle?

8   A.   Yes.

9   Q.   And did Mr. Lewis at that point tell the officer, tell

10   you what his name was?

11   A.   He stated his name was Barry Lewis.  He told both of us

12   that.

13   Q.   And then Officer Gulnac ran a check of Mr. Lewis's name?

14   A.   Yes.

15   Q.   And that turned up as an extraditable hit out in

16   California?

17   A.   Yes.

18   Q.   There was a warrant for Mr. Lewis's arrest?

19   A.   I believe, yes.

20   Q.   At that point Mr. Lewis was arrested?

21   A.   Yes, Officer Gulnac then took him into custody.

22        MS. SANNER:  Your Honor, I have nothing further for

23   this witness.

24        THE COURT:  All right.  Mr. Patton.

25        MR. PATTON:  Thank you, your Honor.

15

1                    CROSS-EXAMINATION

2   BY MR. PATTON:

3   Q.    Officer Sorensen, did you write any reports detailing

4   your activities on the evening of March 28, 2005?

5   A.    Yes, I wrote a brief report on it.

6         MR. PATTON:  Your Honor --

7         THE COURT:  Do you have it with you?

8         THE WITNESS:  I do.

9         MS. SANNER:  It was provided to counsel in

10  discovery.

11        MR. PATTON:  We did not get it in discovery.

12        THE COURT:  Well, you'll get it now.

13        MR. PATTON:  May I have a moment, your Honor.

14        THE COURT:  Yes.

15  BY MR. PATTON:

16  Q.    Officer Sorensen, you were at about 10 o'clock in the

17  evening on March 28, 2005 traveling north on Hickory Street in

18  Warren, Pennsylvania, correct?

19  A.    Yes, I was.

20  Q.    On your screen there do you see this map?

21  A.    Yes.

22  Q.   Okay.  So is it accurate to say you would have been

23  approximately right here, (indicating), at the intersection of

24  Hickory Street and Fourth Avenue?

25  A.   Yes, sir.


16


1  Q.   It's 10 p.m. at night?

2  A.   Yes, sir.

3  Q.   And dark?

4  A.   Yes, sir.

5  Q.   And as you pulled up, as you got to the intersection at

6  Hickory and Fourth Avenue, the light turned red, you had to

7  stop, is that correct?

8  A.   Yes, sir.  I had just left Domestic Relations, it's a

9  stones throw from Domestic Relations.

10  Q.   And so as you were stopping at Hickory and Fourth Avenue,

11  you saw two men walking west on Fourth Avenue crossing in front

12  of your vehicle from right to left?

13  A.   Yes.

14  Q.   Across Hickory?

15  A.   Yes, they crossed across Hickory on Fourth headed towards

16  Poplar Street.

17  Q.  And they were walking side-by-side?

18  A.  Yes, sir.

19  Q.  And you saw one of the people or one of the men walking,

20  the one farthest from your car, walking and carrying an item?

21  A.  Yes, sir.

22  Q.  You didn't know what that item was?

23  A.  I could not see the item as we see it here today.  But I

24  did see him carrying an item wrapped in a sheet or blanket, it

25  appeared to me that it was a rifle.


17


1  Q.  But you didn't see any of the rifle itself, did you?

2  A.  No, sir.

3  Q.  So you didn't know it was a rifle or not, did you?

4  A.  No, I just suspected that it was.

5  Q.  You suspected that based on the length of it?

6  A.  Well, the length of it and I've seen rifles myself, you

7  know, I've seen rifles.  But, you know, I couldn't see the

8  rifle.

9  Q.  Not only was the rifle wrapped in a blanket, it was also

10   inside a garbage bag, correct?

11   A.   Yes, it was partially in the garbage bag with part of it

12   protruding up.

13   Q.   But the part protruding out was wrapped in a blanket?

14   A.   It was in a blanket.

15   Q.   At no time when the men were walking in front of your car

16   crossing Hickory Street, did you ever see a portion of the

17   rifle itself?

18   A.   No, I did not.

19   Q.   Since the two men were walking side-by-side, the

20   gentleman who was closer to your car to some extent interfered

21   with your ability to see the guy that was farther away from

22   your car, correct?

23   A.   He was blocking some of my vision, yes.

24   Q.   Due simply to the fact if two people are walking down the

25   street side-by-side and then cross in front of a car at an

18

1   intersection, just by shear physics of the situation the

2   gentleman closer to the car to a certain extent would block

3   your view of the person that's farther from the car, correct?

4   A.   Yes.

5   Q.   And the gentleman turned out to be Mr. Lewis, the one

6   farthest from your car, who was carrying this item, right?

7   A.   Yes.

8   Q.   He was carrying it up to his body, next to his body,

9   correct?

10   A.   I would say beside his body.

11   Q.   On the side closest to your car, correct?

12   A.   Yes.

13   Q.   He's walking in front of your car, he has this pressed

14   against the side of his body that is actually facing your car,

15   correct?

16   A.   Yes.

17   Q.   At no time did he try to switch the item over and put it

18   on the other side of his body, on the far side of his body from

19   your car, did he?

20   A.   No.

21   Q.   And if the item would have been pressed up against the

22   side of his body, Mr. Lewis's right side, you would have not

23   even been able to see the item, correct?

24   A.   I don't know.

25   Q.   It certainly would have made it harder for you to see it?

19

1  A.    It probably would have made it difficult to see it.

2  Q.    But he kept it on the left side of his body, the side

3  closest to your car?

4  A.    Yes, sir.

5  Q.    And after Mr. Sumrow and Mr. Lewis walked across your

6  car, they continued to head down Fourth Street or Fourth

7  Avenue, correct?

8  A.    Yes, sir.

9  Q.    And they're walking on what would be the south side of

10  Fourth Avenue, correct?

11  A.    Yes, sir.

12  Q.    On the sidewalk?

13  A.    Yes, sir.

14  Q.    And once they crossed Fourth Avenue, they're very quickly

15  out of your view into the darkness, correct?

16  A.    I wouldn't say quickly, I mean there was streetlights, I

17  mean I could still see them.

18  Q.    Well, the Elk's Club is right on the corner, the

19  southwest corner of the intersection of Hickory and Fourth

20  Avenue, correct?

21  A.    Yes.

22  Q.    And they're out of sight by the time they get even with

23  the Elk's Club?

24  A.    No.

25  Q.    They're not out of sight by the time they get even with

20

1  the Elk's Club?

2  A.    No, as the light turned green for me to proceed, I looked

3  to my left.  They were just clearing the crosswalk at that time

4  getting on the sidewalk.  So -- I guess they were out of my

5  sight very quickly to that extent because I had proceeded north

6  again.

7  Q.    So at this point Mr. Lewis has the item still on the left

8  side of his body?

9  A.    Yes.

10  Q.    As Mr. Lewis is walking west, correct?

11  A.    Yes.

12  Q.    As you proceeded north?

13  A.    Yes.

14  Q.    Is that correct?

15  A.    Yes.

16  Q.    So, now the rifle is now opposite of Mr. Lewis's body

17  from where you're located, correct --

18        THE COURT:  Can I make a suggestion.

19        MR. PATTON:  Sure.

20        THE COURT:  You got that map in front of him, with

21  his finger he can trace the route.

22  BY MR. PATTON:

23  Q.    Officer Sorensen, do you see the hand-drawn map that is

24  now on your monitor?

25  A.    Yes.

21

1  Q.    Are you able to read at least the street names?

2  A.    I'm not sure, I think the middle one is Poplar.  But I'm

3  not sure which one is -- as far as Hazel and Hickory streets.

4  Q.    Would you describe the one farthest to the right?

5  A.    Okay.

6  Q.    The one the blue line is on?

7  A.    Right.

8   Q.   That is Hickory Street?

9   A.   Okay.

10  Q.   That one is Poplar?

11  A.   That's Poplar.

12  Q.   Poplar Street, that's in the middle of this map?

13  A.   Yes, sir.

14  Q.   The street that is on the left-hand side of the screen

15  would be Hazel, is that correct?

16  A.   Yes, sir.

17  Q.   That's an accurate representation of how the streets lay

18  out in Warren on Fourth Avenue?

19  A.   Yes.  They continue all the way down though the streets.

20  Q.   Correct.  But as you're traveling west on Fourth Avenue,

21  you hit Hickory Street, then you go farther west the next

22  street is Poplar Street, correct?

23  A.   Correct.

24  Q.   And then the next street farther west is Hazel Street?

25  A.   That's correct.

22

1   Q.   You can touch your screen and where you touch it, it will

2   input like a blue line on or put an arrow.  Is it accurate to

3   say where I'm now drawing a blue line, that's where your car

4   was stopped at the red light?

5   A.   Yes, sir.

6        THE COURT:  You're going to have to say for the

7   record, Mr. Patton, where that is.

8   BY MR. PATTON:

9   Q.   You're on Hickory Street south of Fourth Avenue, correct?

10  A.   Yes, sir.

11  Q.   Heading north?

12  A.   Yes, sir.

13  Q.   And you stop your car before the sidewalk because there's

14  a red light?

15  A.   Yes, sir, before the crosswalk you mean?

16  Q.   Correct, before the crosswalk?

17  A.   Yes.

18  Q.   Then Mr. Sumrow and Mr. Lewis walk in front of your car?

19  A.   Yes, sir.

20  Q.   I believe your testimony was that the light turned green

21  and you are able to then proceed north by the time Mr. Sumrow

22  and Mr. Lewis reached the west side of Hickory Street?

23  A.    Yes, they were crossing in front of me, and I was

24  watching them when the light turned green, they probably had

25  reached --


23


1  Q.    Can you touch the screen?

2  A.    They probably reached this point here, (indicating), in

3  the crosswalk, sidewalk area, and I proceeded to go north.

4  Q.    Okay.  As you proceeded north, as you're trying to then

5  look at Mr. Lewis, the rifle is still on the left side of Mr.

6  Lewis's body, correct?

7  A.    Yes, sir.

8  Q.    Which would be on the south side of Mr. Lewis's body?

9  A.    Yes, sir.

10  Q.    And as you go north, when you get so that you're farther

11  north than Mr. Lewis is, his body then is going to block your

12  view of the rifle, what you think was a rifle?

13  A.    At some point, yes, it would block my view, yes.

14  Q.    At this point you still don't know if it's a rifle or if

15  it's not a rifle?

16  A.    No, I just suspected that it probably was.

17  Q.   But you haven't actually physically seen any part of a

18  rifle itself?

19  A.   No, I have not.

20  Q.   You just seen an item that was wrapped in a blanket that

21  was partially in a garbage bag that you think may be a rifle?

22  A.   Yes.

23  Q.   Now, you go up north on Hickory and then you make a left

24  on Rankin?

25  A.   No, sir, I made a right onto -- I think I made a right


24


1  onto Fifth Street.  And then went over to Liberty Street, which

2  it's not on this map here.

3  Q.   Okay.  So you went north one block to Fifth Street?

4  A.   One block north to Fifth Street.

5  Q.   You turned right, which would be to turn east, correct?

6  A.   Correct.

7  Q.   And went one block east?

8  A.   I went one block east to Liberty Street from Hickory

9  Street.

10  Q.   Okay.  Then you would have turned right?

11  A.    I then turned right onto Liberty Street.

12  Q.    Which you would be heading south on Liberty?

13  A.    On Liberty.

14  Q.    Down to Fourth Avenue?

15  A.    Down to Fourth Avenue again.

16  Q.    And then turned right onto Fourth Avenue?

17  A.    And then turned right, which would be west on Fourth

18  Avenue.

19  Q.    So this has put you, you're now back on Fourth Avenue,

20  but a block further east than you were when you were sitting at

21  Fourth and Hickory?

22  A.    Yes, sir.

23  Q.    And then you start driving west on Fourth Avenue looking

24  for Mr. Lewis and Mr. Sumrow?

25  A.    Yes, sir.


25


1  Q.    And I believe you mentioned you were driving somewhat

2  fairly slow because you are trying to locate them again, is

3  that correct?

4  A.    Yes, I'm not sure what the speed limit is on Fourth

5    Avenue, I was going probably under the speed limit or the speed

6    limit.

7    Q.    You reached Poplar Street without seeing Mr. Lewis or Mr.

8    Sumrow, correct?

9    A.    That's correct.

10   Q.    As you were then driving west on Fourth Avenue between

11   Poplar and Hazel, as you were approaching Hazel, you saw Mr.

12   Lewis and Mr. Sumrow walking west on the sidewalk, correct?

13   A.    As I was approaching Hazel?

14   Q.    Yes.

15   A.    Yes.

16   Q.    As you got to Hazel Street, while you were traveling west

17   on Fourth Avenue, Mr. Lewis and Mr. Sumrow, while walking west

18   on the sidewalk, south of Fourth Avenue, they themselves were

19   approaching Hazel, getting close to Hazel, correct?

20   A.    Yes, sir.

21   Q.    They were getting very close to actually walking from the

22   sidewalk onto the road -- to walk across Hazel, correct?

23   A.    Yes, sir.

24   Q.    And so they're getting close to walking from the sidewalk

25   that runs parallel to Fourth Avenue, getting to Hazel and

1  actually getting to the point where the sidewalk ends and Hazel

2  Street begins, correct?

3  A.   Yes, sir.

4  Q.   And you make a left turn off of Fourth Avenue onto Hazel,

5  correct?

6  A.   Yes, sir.

7  Q.   And you pull your car up directly in front of where the

8  sidewalk that runs parallel to Fourth Avenue on the south side,

9  and you pull your car perpendicular to the sidewalk at Hazel,

10  correct?

11  A.   I believe that my vehicle was probably, probably for the

12  most part in the crosswalk.  I'm not sure it was completely in

13  the crosswalk.  I want to say it was kind of at an angle.

14         THE COURT:  Draw it, please.

15         THE WITNESS:  I just did it.

16         THE COURT:  You're one step ahead of me.

17         THE WITNESS:  And that was the reason I activated my

18  lights, I didn't feel as though I was in an area where it was

19  safe, I thought I should activate my lights so I don't get

20  oncoming traffic hitting me or hitting us for that matter.

21  BY MR. PATTON:

22  Q.    Oncoming traffic from where?

23  A.    Well, from Fourth Avenue or from Hazel Street.

24  Q.    Well, Hickory Street is wide enough so you can pull your

25  car up alongside the curb on the right side of the road, which

27

1  would be the southbound traffic lane, you could have stopped

2  your car there without creating any traffic hazard, correct?

3  A.    Well, it's got a traffic light that stops the traffic.

4  Q.    At the intersection of Fourth Avenue and Hazel is a

5  traffic light?

6  A.    I thought you said Hickory Street.

7  Q.    I apologize.  Hazel Street is wide enough so that when

8  you turn left from Fourth Avenue onto Hazel, you can pull your

9  cruiser all the way over to the curb on what would be the west

10  side of Hazel Street and park your cruiser there so that it

11  would be legally parked and would not create any particular

12  hazards?

13  A.    You could do that.  But I'm not sure I did that.

14  Q.    Well, if you pulled your car up all the way to the side,

15  just like any other car that is parallel parked along Hazel

16  Street, you wouldn't have to activate your emergency lights to

17  prevent someone from hitting you, would you?

18  A.    Probably not if you pulled up as you're saying, directly

19  to the curb as anyone else would park.  I'm not sure I did

20  that.  As I said, I think my vehicle was at a slight angle.  I

21  didn't take the time to just pull in and maneuver the vehicle

22  so it was legally parked.

23  Q.    Why not?

24  A.    Well, because I was getting out of the vehicle, I saw

25  them, I was getting out of the vehicle.  I thought what I had

28

1  seen was a weapon, so I pulled my vehicle over, I activated the

2  lights for safety reasons, and asked Mr. Lewis what he had in

3  the bag.

4  Q.    At the point you turn onto Hazel, Mr. Sumrow and Mr.

5  Lewis are almost on the street, Hazel Street, correct?

6  A.    Yeah, I would say that they were on, just stepping onto

7  the street when I pulled up into the crosswalk.

8  Q.    So they're stepping into the crosswalk, you pull your car

9   into the crosswalk, stop your car in the crosswalk and activate

10   your lights?

11   A.   Yes, sir.  As I said, I believe that my car was not

12   completely blocking the crosswalk, yes, it was in the

13   crosswalk, yes, I would agree with that.

14   Q.   They would have had to walk, they could not have

15   continued walking in the crosswalk and made it across Hazel

16   Street?

17   A.   Probably not.  Not without diverting around my vehicle.

18   Q.   They'd have to go out of the crosswalk to get around your

19   vehicle?

20   A.   Probably.

21   Q.   So you pull your vehicle into the crosswalk, at least far

22   enough so Mr. Sumrow and Mr. Lewis, as they're stepping into

23   the crosswalk, could not make it -- could not make it across

24   the street without walking around your car; and then you

25   activate your emergency lights?


29


1  A.   I would say that's probably fairly accurate, yes.

2  Q.   And at this point Mr. Sumrow and Mr. Lewis --

3          THE COURT:  I want to get the sequence again, I

4     missed the question.  When, in relation, let me just ask it

5     this way.  When did you activate your overhead flashers?

6          THE WITNESS:  As I pulled onto Hazel Street, I put

7     the vehicle in park and would have activated --

8          THE COURT:  At the same time you were bringing the

9     vehicle to a stop?

10          THE WITNESS:  Pretty close to the same time.  I

11     believe it's on the same side of the vehicle, the emergency

12     activation switch and the gear shift.

13          THE COURT:  I'm not familiar with the police cars

14     down there, but do you have, when you activate it, what kind of

15     lights go on on the police car, can you describe that for me?

16     THE WITNESS:  It would be your standard red and blue

17     flashers, strobe type lights.

18          THE COURT:  Is that on top of the police car?

19          THE WITNESS:  Yes, sir, it's on the roof of the

20     police car.

21          THE COURT:  All right, go ahead.

22     BY MR. PATTON:

23     Q.    That's a marked sheriff's department patrol car, correct?

24   A.   Yes, sir.

25   Q.   It's marked prominently with Warren County Sheriff's

30

1    Department?

2    A.   Yes, sir.

3    Q.   When you activate the emergency lights, does that cause

4    your headlights to flash on and off?

5    A.   I believe that it does, but some of the vehicles don't do

6    that because they've been having some problems with that.  But

7    I believe it probably did.

8    Q.   And on the light bar that's on the top of the car, okay?

9    A.   Yes, sir.

10   Q.   On the ends of the light bar, are there spotlights?

11   A.   Yes, sir.

12   Q.   So those spotlights are activated when you put the

13   overhead lights on?

14   A.   Correct.  No, I don't believe those activated.  Those are

15   what we call alley lights.  They have a separate push button

16   switch.  The strobe lights is a toggle switch, you just push to

17   the right.  The alley lights, which you're speaking of, you

18  have to push for the alley light, the alley light or the front

19  take-down lights, you have to push the button down, they have

20  push buttons.

21  Q.    Mr. Lewis and Mr. Sumrow are stepping onto Hazel Street

22  in the crosswalk?

23  A.    Yes, sir.

24  Q.    You pull your car turning left off of Fourth Avenue into

25  the crosswalk on Hazel street, correct?

31

1  A.    Yes, sir.

2  Q.    And at this point Mr. Lewis and Mr. Sumrow are within 10

3  feet of your car?

4  A.    I would say yes, 10 to 15 feet.  They kept walking

5  towards my car as I was getting out.

6  Q.    You put on your emergency lights?

7  A.    Yes.

8  Q.    And so when you step out of your vehicle, you're in full

9  uniform, correct?

10  A.    Yes, sir.

11  Q.    At that point they're very close to you, is this correct?

12  A.   Yes, sir.

13  Q.   And so now you're in front of them and you're standing

14  directly in front of them, correct?

15  A.   Yes, sir.

16  Q.   In the crosswalk?

17  A.   Yes, sir.

18  Q.   With your car directly behind you?

19  A.   Yes, sir.

20  Q.   With your emergency lights flashing?

21  A.   Yes, sir.

22  Q.   You ask them what's in the bag, you ask Mr. Lewis what's

23  in the bag?

24  A.   Yes, sir.

25  Q.   And it is after you put your lights on, exit your vehicle


                                    32


1  and approach him and you're in full uniform and ask him that

2  question, that Mr. Lewis answers you and tells you what's in

3  the bag?

4  A.   Yes, sir.

5  Q.   And you got out of your vehicle because you wanted to

6    speak with Mr. Lewis and Mr. Sumrow, correct?

7    A.    Yes, sir.

8    Q.    And when you approached them, you thought maybe he's got

9    a rifle, correct?

10   A.    Yes, sir.

11   Q.    But you don't know if he's got a rifle?

12   A.    I don't know that at that time, just suspect.

13   Q.    And you were going to question them, at least Mr. Lewis,

14   about what the item was he was carrying?

15   A.    Yes, sir.

16   Q.    And you were going to get an answer from him?

17   A.    Well, I assumed he would answer me.

18   Q.    Because you just pulled your car in front of him and put

19   your emergency lights on and questioned him about what he's

20   got, correct?

21   A.    I assumed he would answer me because I had asked him and

22   I had a police car, I would assume he would answer me.

23   Q.    Did you have your police car with your lights activated,

24   which is your way of showing as a police officer, hey, I want

25   to speak with you?

33

file:///A|/LEWISSUP.TXT

1  A.   I guess you could say that but, again, my reason for

2  putting the lights on was for safety sake.  They were

3  approaching me, I didn't want a car to come along and hit us.

4  Yeah, I would say yeah, they would think he wants to talk to

5  us.

6  Q.   After you are told the item in the bag is a rifle, do you

7  physically take possession of the item?

8  A.   He handed it to me.

9  Q.   Did you look to see what it was?

10  A.   Yes.

11  Q.   Did you identify it as a rifle?

12  A.   Yes.

13  Q.   And at that point some Warren city police officers

14  arrived on the scene?

15  A.   One officer, Officer Gulnac arrived on the scene.

16       THE COURT:  What was his name, sir?

17       THE WITNESS:  Gulnac, I believe it's G-u-l-n-a-c,

18  but I'm not certain of that.

19       MR. PATTON:  I believe that's the spelling, your

20  Honor.

21       THE COURT:  All right.

22  BY MR. PATTON:

23  Q.    Had you been handed the rifle prior to the time Officer

24  Gulnac shows up?

25  A.    Yes, sir.

34

1  Q.    How long had you had the rifle by the time he shows up?

2  A.    A few seconds, 15, 20 seconds, I would think.  It wasn't

3  very long.

4  Q.    And you had called out before you stopped Mr. Lewis and

5  Mr. Sumrow and asked for some city units to come and assist

6  you, correct?

7  A.    As I had crossed the intersection of Fourth Avenue from

8  Hickory Street, I had radioed what I had seen, and I believe it

9  was Officer Gulnac that answered me.  I just asked him to head

10  that way in case that's what it was.

11  Q.    After Mr. Lewis turned the rifle over, you wanted to do

12  some checking to find out what the story was with that rifle

13  before you decided whether you were going to let Mr. Lewis and

14  Mr. Sumrow move or not, correct?

15  A.    I believe, I didn't really check on it, at that point I

16  turned it over, when Officer Gulnac arrived, I turned it over

17  to him, I said it is a rifle.  And he radioed to check on what

18  it was, whether it was reported stolen or what.

19  Q.    And while Officer Gulnac was doing that, you stayed with

20  Mr. Sumrow and Mr. Lewis, correct?

21  A.    Well, I would say we were all standing fairly close to

22  together, within -- what you would you call a communication

23  distance or normal speaking distance.

24  Q.    Did other officers besides Officer Gulnac then show up?

25  A.    No, I don't believe so.  I don't believe anybody else

35

1  showed up.

2  Q.    But you and Officer Gulnac were not willing to let Mr.

3  Lewis and Mr. Sumrow leave until Officer Gulnac had called in

4  the serial number of the rifle?

5  A.    Yeah, I would say that was accurate.  I need to correct

6  one thing.  I do believe there was a state trooper that did

7  show up, quite sometime later.  It wasn't right away.  He had

8  just heard the call and he had headed that way, also.  I never

9  heard him call on the radio saying he was coming or anything

10   like that.  But I do believe a trooper showed up, I wanted to

11   mention that.

12   Q.    So your car is still sitting there with the lights

13   flashing, right?

14   A.    Yes.

15   Q.    And Officer Gulnac comes in a marked city patrol unit?

16   A.    Yes.

17   Q.    He's uniformed?

18   A.    Yes.

19   Q.    And he activates his lights when he gets there?

20   A.    I don't know whether he activated his lights or not, to

21   be honest with you, I don't know.  I would think he probably

22   did, I don't know if he did or not.

23   Q.    So you and Officer Gulnac are standing, speaking with Mr.

24   Sumrow and Mr. Lewis, correct?

25   A.    Yes.


36


1   Q.    And you are keeping them there until you can call in the

2   serial number on the rifle to check to see if it comes back

3   stolen, correct?

4  A.    Yes, because Mr. Lewis said he found it, he said he found

5  it in the garbage.  Officer Gulnac was trying to figure out --

6  Q.    He was trying to check to see if it was a stolen firearm?

7  A.    Right.

8  Q.    You were going to keep Mr. Lewis and Mr. Sumrow there

9  with you until that check was done?

10  A.    I'm not sure what you mean by keep them there, do you

11  mean did we have them in custody?

12  Q.    You weren't going to allow them to leave until Officer

13  Gulnac called in the serial number to see if the rifle was

14  stolen?

15  A.    I'm not sure I really understand, they didn't ask to

16  leave.  They walked over to the other corner of the street,

17  across from my patrol car, they walked over to here

18  (indicating).

19  Q.    While you were still accompanying them?

20  A.    While we were there.  Because other people, other

21  pedestrians were walking to the area and they were talking with

22  them.

23  Q.    Did Officer Gulnac ask questions of Mr. Lewis as to how

24  Mr. Lewis found the gun?

25  A.   I believe he asked him where the gun came from.


37


1  Q.    And this was after you had told Officer Gulnac that Mr.

2  Lewis had told you that he found the firearm in the trash?

3  A.    I believe so, yes.

4  Q.    And Officer Gulnac then asked Mr. Lewis himself where Mr.

5  Lewis found the firearm?

6  A.    Yes, I think he was trying to get a more specific

7  location of where he found the gun.  He just told me, you know,

8  I found it in the garbage and handed it to me.

9  Q.    You guys hadn't had any reports of a firearm being

10  stolen?

11  A.    I hadn't, I don't believe anybody did, no.

12        MR. PATTON:  May I have a moment, your Honor.

13        THE COURT:  All right.

14  BY MR. PATTON:

15  Q.    Just for clarification, I don't know if we made this

16  clear, the garbage bag that the item was in, was a black bag?

17  A.    I would say it was green and black, it was dark.

18  Q.    It was dark, it was opaque, meaning you couldn't see

19  through it?

20  A.    No, you couldn't see through it.

21        MR. PATTON:  Those are my questions.

22        THE COURT:  Ms. Sanner, do you have any redirect?

23        MS. SANNER:  Just very briefly, your Honor.

24        THE COURT:  Okay.

25        MS. SANNER:  Thank you, your Honor.


38


1              REDIRECT EXAMINATION

2  BY MS. SANNER:

3  Q.    When you first saw the two men walking in the street,

4  what was it that really attracted your attention to them?

5  A.    Well, they walked directly in front of my patrol car and,

6  again, I felt that he was trying to hide something from my

7  view.

8  Q.    If the gun hadn't been concealed, if it had been out in

9  the open, would that also have attracted your attention?

10  A.    I would think so at that time of night.

11  Q.    Because of the time of night; what about the location

12  where you saw them?

13  A.    Yes, it's within the city limits, I don't normally see

14  people carrying a gun at that time in city limits.

15  Q.    Was it hunting season?

16  A.    No.

17  Q.    What about their body movement that also suggested that

18  they were trying to conceal the weapon from you?

19  A.    Yes, like I said, I believed that Mr. Lewis was

20  attempting to use Mr. Sumrow as a shield to block my view, and

21  also the way Mr. Lewis, I call it stiff-armed, he wouldn't let

22  his arms move freely, he was just holding it stiff to his side.

23  Q.    Walking as they were in lock step with the gun between

24  the two gentlemen, shielding the weapon not only from your

25  view, but also from passersby?

39

1  A.    I would say so.

2  Q.    How close were you to the police station?

3  A.    I was a block from the police station.  The Warren City

4  Police station -- I believe it's like down in this vicinity

5  here, (indicating).

6  Q.    You were a block from the police station, you would

7  estimate?

8          THE COURT:  Where is the police station, let's put

9  it that way?

10          THE WITNESS:  I'm sorry.

11          THE COURT:  Where is the police station located?

12          THE WITNESS:  The police station is located on Third

13  Street and -- I'm sorry, let me retrace that, that's not

14  correct where it is.  The police station is located on Third

15  Street, and it would have been, I'm trying to think here, it's

16  not where I made this mark, it's not on Poplar Street, it's

17  on -- I'm trying to get my bearings here.  Could I see that

18  other map.

19          THE COURT:  How often do you visit your police

20  station?

21          THE WITNESS:  That's not my police station -- I

22  really don't go there too much, to be honest with you.  I

23  believe the police station would have been at Third, actually

24  right between Third or Hickory and Poplar.

25  BY MS. SANNER:

40

1  Q.   Did in fact other people approach during the encounter

2  with the defendant?

3  A.   Yes.

4  Q.   People were walking down the street?

5  A.   Yes.

6  Q.   And when you pulled over to speak with the defendant, did

7  you activate your siren, also?

8  A.   No, I did not.

9        THE COURT:  Excuse me one second.  You were just

10  asked did other people approach walking down the street, you

11  said yes; who are those people, who did you mean?

12        THE WITNESS:  The people that I know that walked

13  down the street were, one said she was Mr. Lewis's sister, who

14  he was supposedly living with.  And one would have been Mr.

15  Sumrow's mother, I believe.  And the other person was Sumrow's

16  sister.

17  BY MS. SANNER:

18  Q.   As far as other people that were on the street, there

19  could have been a policeman in the area that might have seen

20  the rifle the defendant was trying to shield with his body?

21  A.   Yeah, I just happened to be the one that happened to come

22  along.

23  Q.   Did the defendant want to keep the gun?

24  A.   Yes, he said he was going to turn it into the police

25  station.  If nobody claimed it, he wanted to keep it.


41


1  Q.   So when you checked to see if it was stolen -- well,

2  Officer Gulnac checked to see if it was stolen, the defendant

3  remained in the area where you were, he didn't ask to leave, he

4  asked to have the weapon back if no one claimed it?

5  A.   Yes.  And the police station is at 318 West Third.  I'm

6  sorry, it is actually Liberty Street, it's not marked on here.

7  Liberty is this one here.  So the police station is in this

8  corner there, (indicating).

9  Q.   You didn't make any effort to detain the defendant's

10  movement, did you?

11  A.   No.

12  Q.   In fact, he crossed the street, continued across the

13  street after you approached?

14  A.   Yes.

15  Q.   And moved about in the area and talked to other people

16  that were in the area?

17  A.   Yes.

18  Q.   It was at that point he was arrested?

19  A.   He was arrested by Officer Gulnac when Officer Gulnac

20  found out there was an active warrant for him from California.

21       MS. SANNER:  I have nothing further, your Honor.

22       THE COURT:  Anything else, Mr. Patton?

23       MR. PATTON:  No, your Honor.

24       THE COURT:  Officer, who asked him what his name was

25  and when was that question asked?


                    42


1       THE WITNESS:  I believe -- I believe Officer Gulnac

2  asked him for his name and identification.  He said he didn't

3  have any identification on him.  Officer Gulnac arrived within

4  seconds after --

5       THE COURT:  How was it determined what his name was?

6       THE WITNESS:  He finally did say what his name was.

7  He said he didn't have any identification on him, it was in his

8  luggage, his luggage had been stolen.  Officer Gulnac ran him

9  just based on what he provided Officer Gulnac.

10       THE COURT:  Finally, did he give you his name before

11   or after you had run the check on the rifle?

12          THE WITNESS:  After.

13          THE COURT:  All right.  Thank you, sir, you're

14   excused.

15          MS. SANNER:  The government next calls Warren City

16   Police Officer Brian Gulnac.

17          THE COURT:  You can do that in a few minutes after

18   we take a short break here.

19          (Recess from 10:56 a.m.; until 11:02 a.m.)

20          THE COURT:  All right, come on up here to be sworn.

21   Would you give your full name to my court reporter and spell

22   it, please?

23          THE WITNESS:  Brian Gulnac, G-u-l-n-a-c.

24           BRIAN GULNAC, GOVERNMENT WITNESS, SWORN

25              DIRECT EXAMINATION


                                43


1   BY MS. SANNER:

2   Q.    Officer Gulnac, state your name for the record?

3   A.    Brian Gulnac.

4   Q.    And how are you employed?

5   A.   I'm employed by the Warren City Police Department.

6   Q.   How long have you been with the Warren City Police

7   Department?

8   A.   Three years.

9   Q.   What are some of your duties with the Warren Police

10  Department?

11  A.   My duties include enforcing the crimes code, the vehicle

12  code.  Conducting investigations, routine patrol, answering

13  calls to duty.

14  Q.   Were you on duty on March 28, 2005?

15  A.   Yes, I was.

16  Q.   What was your work shift that day?

17  A.   I was working 3 to 11.

18  Q.   Is that p.m.?

19  A.   Yes.

20  Q.   At about 10 p.m. where were you?

21  A.   I was on station at the Warren City Police Department.

22  Q.   And what happened?

23  A.   I was called by Deputy Sorensen, who stated that he

24  observed two males walking on Fourth Avenue and one of them

25  appeared to be carrying a firearm.

44

1   Q.   Did he request backup?

2   A.   Yes, he did.

3   Q.   What did you do?

4   A.   I basically asked him again where exactly on Fourth

5   Avenue he was.  And then I went to his location.

6   Q.   You got into your patrol vehicle and drove to where he

7   was?

8   A.   That's correct.

9   Q.   About how long did it take you to get from where you were

10   stationed, into the patrol vehicle, and then to the location

11   where you met with Officer Sorensen?

12   A.   I was there within two minutes.

13   Q.   And it was dark at 10 p.m.?

14   A.   Yes.

15   Q.   How was the area illuminated?

16   A.   At the time I arrived there, it was very poorly

17   illuminated.

18   Q.   What did you do?

19   A.   I activated the take-down lights on top of my patrol

20  vehicle.

21  Q.   Who did you see in front of you?

22       THE COURT:  Excuse me, just for the record, what are

23  take-down lights?

24       THE WITNESS:  Take-down lights are the two lights on

25  the top of the light bar that basically can be used for several


                              45


1  different things.  If you're doing a traffic stop, you can

2  illuminate the back of the vehicle right in front of the patrol

3  vehicle.  Of if you're talking to some subjects and it's dark

4  out, you can illuminate the area so other people, including

5  yourself, can see what is going on there.

6  Q.   Did you have your siren on?

7  A.   No.

8  Q.   How many officers were there?

9  A.   Myself and Deputy Sorensen.

10  Q.   And Mr. Sorensen was talking with how many people?

11  A.   Two.

12  Q.   When you arrived and you approached the three people, did

13  you run, how did you approach?

14  A.  I walked over to them.

15  Q.  Did you have your weapon drawn?

16  A.  No.

17  Q.  Did you flash a badge?

18  A.  No.

19  Q.  What happened as you approached?

20  A.  I spoke to Deputy Sorensen, who handed me a black plastic

21  garbage bag with a brownish-colored blanket, and inside of that

22  contained a 30-30 rifle.

23  Q.  Where did you understand that weapon came from?

24  A.  The defendant had stated that he found it in the trash.

25  First he told me he found it just up the street on Fourth


46


1  Avenue laying in the grass.  Then he stated, well, I seen it

2  leaning up against a tree when I was digging through the

3  garbage, which I do regularly because you always find good

4  stuff in the garbage.

5  Q.  When you first received the weapon, you understood he had

6  taken it from, he picked it up from the trash, is that right --

7  am I confusing you; when you first received the weapon from

8   Officer Sorensen --

9   A.   Okay.

10  Q.   Did you at that point know that the defendant's

11  explanation was he had found the weapon in the trash --

12  that's what Deputy Sorensen told you?

13  A.   Yes.

14  Q.   What did you do with the weapon as you held it?

15  A.   As I held it and walked back towards my patrol vehicle, I

16  cleared the weapon, made sure it was not loaded.  And it was

17  not.  I advised my dispatch of the serial numbers and asked her

18  if she could check to make sure to see if the firearm was

19  stolen.

20  Q.   Was the firearm stolen?

21  A.   No.

22  Q.   What did you do with the weapon after you learned it

23  wasn't stolen?

24  A.   I secured it on the passenger side of my patrol vehicle

25  and locked the doors.


47


1   Q.   Why did you secure it in your patrol vehicle?

2  A.    Basically, it's lost property.  He said that he found it

3  laying on the road, and the weapon itself was a nice looking

4  30-30.

5  Q.    It was in good condition?

6  A.    That's correct.  And it had a scope on it, it looked like

7  a nice deer hunting rifle or something, I just couldn't imagine

8  somebody throwing it away.  I figured somebody might have lost

9  it or something, I wanted to basically be able to give it back

10  to the owner when he called to report it stolen.

11  Q.    You secured it into the vehicle and then you approached

12  Sorensen, Lewis and the third person that was there?

13  A.    That is correct.

14  Q.    At that point did you ask them for identification?

15  A.    Well, I knew the third subject as Terry Sumrow.

16  Q.    You knew him from past experience?

17  A.    That's correct.

18        THE COURT:  Could you spell the name, please?

19        THE WITNESS:  S-u-m-r-o-w.

20  BY MS. SANNER:

21  Q.    You knew Mr. Sumrow from past experience?

22  A.    That's correct.

23  Q.    You didn't have to ask him for identification?

24  A.    No.

25  Q.    You asked the defendant for identification?


                              48


1   A.    Yes, I spoke to the defendant, I said do you have any

2   identification on you.  He said no.  I said have you ever had

3   any type of photo ID or anything issued by any of the states --

4   so we can run that through our computer and verify who he is.

5   He said no, I haven't.  Then he come back and said well, I had

6   something a long time ago in West Virginia.  I was like all

7   right.  So I took his name, his date of birth, I relayed that

8   to the dispatcher, along with possibly check West Virginia to

9   see if he had any type of identification there.

10  Q.    When you ran his name through dispatch, you learned he

11  had an extraditable warrant out of California?

12  A.    That is correct.

13  Q.    Did he ask for the gun back?

14  A.    Yes, he had stated several times he said well, you know,

15  can I just hold onto it and if somebody calls for it, they can

16  just get a hold of me and take it back.  I said well, no, I'd

17  rather keep it and secure it at our station.

18    Q.    Did he give you alternate stories about how he found the

19    gun?

20    A.    Yeah.  Like I said, first he said he found it laying on

21    the ground along the road when he was picking through the

22    garbage.  Then he said it was laying up against a tree out by

23    the garbage.  He said he found it on Fourth Avenue.  Which we

24    were standing at the corner basically on Fourth Avenue.  So I

25    had looked up and down the road, and the only thing I seen was

49

1    there was one white garbage bag, I believe there was two or

2    three black garbage bags.  And they were sitting basically

3    further west than the defendant and Mr. Sumrow were.  They were

4    walking in a westerly direction, they hadn't walked up to where

5    these garbage bags were yet.  So I'm not sure if it was garbage

6    night in that area.  If it was, there wasn't many people that

7    had their garbage out.

8    Q.    When you asked him for his identification, was he under

9    arrest at that point?

10    A.    No.

11    Q.    Was he detained at that point?

12  A.    No.

13  Q.    Could he have moved about?

14  A.    Yes.  As a matter of fact and he did.

15  Q.    He moved about during the course of the interview?

16  A.    Yes, he did.

17  Q.    Where did he go to?

18  A.    Like I said, when we initially started, we were in the

19  area of Fourth and Hazel.  He would have been on the east side

20  of that intersection.  We were talking to him and Mr. Sumrow

21  there basically, in front of my patrol vehicle, right in that

22  area.  Then another female had walked up, she was walking up

23  Hazel Street, come to find out when she got closer, it was Dawn

24  Sumrow, which is Terry's sister.  So the defendant and Mr.

25  Sumrow walked across the road and went over and talked to her,


50


1  myself and Deputy Sorensen walked that way along with them.

2  Q.    How long was it you were together?

3  A.    From the initial time I got there, which was 2213, so it

4  would have been 13 minutes after 10, until I placed him into

5  custody, was 17 minutes.

6   Q.   And you placed in custody because of the extraditable

7   warrant?

8   A.   That's correct.

9   Q.   It was not for possessing the weapon?

10  A.   No.

11  Q.   The weapon wasn't even stolen?

12  A.   No, it didn't come back as stolen.

13  Q.   He was never detained?

14  A.   No.  As I said he was walking around.

15  Q.   Guns were not drawn?

16  A.   No, at no time.

17  Q.   He wasn't told he wasn't free to leave?

18  A.   No.

19  Q.   Did you sense that he wanted to keep the rifle?

20  A.   Yeah, that's correct.

21  Q.   He was waiting to see if you would return the rifle to

22  him?

23  A.   Like I said, he stated several times that he wanted to

24  keep this, if anybody were to claim it, then they could get a

25  hold of him, he would give it back to them.

1  Q.   But you kept the weapon?

2  A.   That is correct.

3  Q.   When you learned that an extraditable warrant existed,

4  you arrested and cuffed him at that point?

5  A.   That is correct, and I placed him in the back of my

6  patrol vehicle.

7  Q.   And you transported him to the Warren police station?

8  A.   That's correct.

9  Q.   When you got to the Warren police station, did you do an

10  inventory of the items that were on him?

11  A.   Yes, I did.

12  Q.   Did you keep any those items?

13  A.   I kept two of the items.  The first item was the 30-30

14  rifle.  The second item, there was a small piece of plastic, it

15  was a piece of a pen, it was clear, it contained a white

16  powder.  So I had kept that as well.  I had field tested that

17  for cocaine.  Which came back negative.

18  Q.   So you field tested it for cocaine but it didn't end up

19  being cocaine?

20  A.   I field tested it for cocaine, that's what it looked like

21   and it was not.

22   Q.   The two items you ended up taking were that straw with

23   apparent white substance in it and the gun?

24   A.   That's correct.

25   Q.   And there were more items?


52


1    A.   Yes, there were.

2    Q.   What did they include?

3    A.   Well, I believe he had three cents.  There were several

4    tissues.  He had a ton of tissues with him.  They were in his

5    coat pocket, they were in his pants pocket.  He had a

6    brownish-colored blanket.  He a black garbage bag.

7    Q.   Were those the items that the gun was wrapped in?

8    A.   That's correct.

9    Q.   They were inventoried, they stayed with his property?

10   A.   That's correct.

11        MS. SANNER:  I have nothing further, your Honor.

12        THE COURT:  Before Mr. Patton asks you some

13   questions, I just have two.  Where did you park in relation to

14   the other officer, Officer Sorensen's vehicle, when you pulled

15  onto the scene?

16      THE WITNESS:  When I arrived, I came in off of

17  Fourth Avenue, I was traveling west.  I pulled in, basically,

18  in the parking lane on the south side of the intersection,

19  turning my vehicle --

20      THE COURT:  Could someone put that map up, please.

21      MR. PATTON:  If he hits the upper left-hand corner

22  of the screen, it will take that stuff off.

23      THE COURT:  If you mark it with your finger, you can

24  show me where you parked, if you would?

25      THE WITNESS:  Okay.  Basically, the location is

53

1  Fourth and Hazel.  That would be right here, (indicating).

2  I pulled in and basically parked right in this direction, with

3  my car angled towards the deputy's vehicle, who was basically

4  on Hazel Street.

5      MR. PATTON:  He may be confused because he hasn't

6  seen this map before.  I believe they were walking on the south

7  side of Fourth Avenue.

8      THE WITNESS:  That's correct.

9          MR. PATTON:  On this map the south side of Fourth

10   Avenue --

11          THE COURT:  I'm sorry, let's do this.  Rather than

12   me trying to piece this together, you now have the opportunity

13   to cross-examine.  So go ahead.

14          MR. PATTON:  Your Honor, first, Ms. Sanner has

15   provided a copy of Officer Gulnac's report.  But it is

16   redacted.  Under Rule 26.2, it states that "if the party who

17   called the witness claims that the statement contains

18   information that is privileged, or does not relate to the

19   subject matter of the witness's testimony, the court must

20   inspect the statement in camera."

21          THE COURT:  Hang on a second.

22          MR. PATTON:   It's under subsection (c).

23          MS. SANNER:  Your Honor, I can probably shortcut

24   this.  We're not claiming any type of privilege.  I don't

25   believe he's entitled to a copy of Officer Gulnac's report, he

54

1   hasn't relied on it.  But I did provide a redacted copy.  The

2   sections that were redacted refer to the witness's statements

3   who is testifying on the defendant's behalf today.  That's why

4   I redacted it.  However, I am willing to give an unredacted

5   copy to the defendant.

6        THE COURT:  This moves this right along, in the

7   absence of privilege, I was going to direct that anyways.  Can

8   you give him an unredacted copy?

9        MS. SANNER:  Yes.

10        THE COURT:  Do you need a few minutes to look at

11   that report?

12        MR. PATTON:  Yes, your Honor.

13                CROSS-EXAMINATION

14   BY MR. PATTON:

15   Q.    Officer, at approximately 10 p.m. on March 28, 2005, you

16   were at the Warren City Police Department?

17   A.    That's correct, I was in dispatch.

18   Q.    You heard Officer Sorensen call in over the radio asking

19   for assistance from a city of Warren police officer?

20   A.    That is correct.  Normally I wouldn't have heard that

21   unless I was in either my patrol vehicle or in dispatch because

22   I don't have my radio on scan.  So I was in dispatch.  There

23   was a very brief time delay, but between the time that I

24   answered Mr. Sorensen or Deputy Sorensen on the radio, because

25  you have to hit a couple different buttons on our base station


55


1   to be able to talk on the sheriff's channel.

2   Q.   And Deputy Sorensen said that he had seen two males

3   walking west on Fourth Avenue, one of them carrying a rifle or

4   something that was sticking out of a bag?

5   A.   That is correct.

6   Q.   And he asked for assistance from some city of Warren unit

7   in helping him investigate that, correct?

8   A.   Right.

9   Q.   And you got clarification from Deputy Sorensen about

10  where on Fourth Avenue he had seen the males, correct?

11  A.   That's correct, I verified where.

12  Q.   So you could go out and assist Deputy Sorensen?

13  A.   That is correct.

14  Q.   Because your understanding is that Deputy Sorensen was

15  going to try find these people and stop them and question them,

16  correct?

17  A.   It was my understanding that Deputy Sorensen wanted to

18  talk to these individuals, that's correct.

19  Q.    He was calling for backup to help him in either finding

20  them -- or in questioning them?

21  A.    Yes and no.  There's several different ways to call for

22  backup.  I mean somebody screaming over the radio hey, I need

23  help.  Or hey, I'm looking for these guys, can you come out and

24  help try to find them, so can we talk to them or whatever.

25  There's the urgent hey, we got to get there.  There's the hey,


                              56


1  we got to get there.

2  Q.    You got there within two minutes?

3  A.    That's correct.

4  Q.    But by the time you arrived at the scene, Deputy Sorensen

5  already had the two men stopped and was speaking with them,

6  correct?

7  A.    He was talking to them at the time I arrived, that's

8  correct.  I had seen Deputy Sorensen get there as I was going,

9  I seen Deputy Sorensen grab or get the black plastic bag and

10  the brownish-colored blanket from the gentleman that was

11  wearing a bluish-colored coat.

12  Q.    Okay.  Now, this happened at the corner of Fourth Avenue

13    and Hazel street?

14    A.    The location I have listed is Fourth Avenue and Hazel.

15    Q.    If you look on your screen, you see a hand-drawn map that

16    has Fourth Avenue and it has Poplar Street; but then it also

17    has Hazel Street, do you see that?

18    A.    Correct.

19    Q.    You said you came onto Fourth Avenue, is that correct?

20    A.    I came onto Fourth Avenue yes, I went up Hickory Street

21    and turned onto Fourth.  Our station is located at Third and

22    Hickory, which is one block down and two blocks over.

23    Q.    So you were coming west on Fourth Avenue?

24    A.    Correct.

25    Q.    Okay.  And you saw Deputy Sorensen pull his vehicle onto

57

1    Hazel street?

2    A.    I can't recall exactly if I seen him pulling onto Hazel.

3    But his vehicle was on Hazel, I seen him get out.  I don't know

4    at what point I initially observed him.  Whether I observed the

5    vehicle in motion or whether I observed him after he had put it

6    in park.  I observed him exit the vehicle, go to talk to the

7    subjects and get the bag from the defendant.  Who was wearing a

8    bluish-colored coat.

9    Q.    Deputy Sorensen had parked the sheriff's patrol vehicle,

10   correct?

11   A.    That is correct.

12   Q.    He had his emergency lights activated?

13   A.    Yes, that is correct.

14   Q.    And so you then turn left from Fourth Avenue onto Hazel?

15   A.    Now that I realize the map here, what I was kind of --

16   yeah, I turned left onto Hazel, but I was kind of in the middle

17   of Fourth Avenue and Hazel both.  Right at the corner was about

18   the middle of my patrol vehicle, I was angled in between the

19   two.  I wasn't actually on either one, I was kind of on both.

20   Q.    Could you mark on the screen approximately where your

21   vehicle was?

22   A.    I pulled in off of Fourth, my vehicle was sitting in that

23   direction, right in that area, (indicating).

24   Q.    Is it accurate to say Deputy Sorensen's vehicle would

25   have been in this area, (indicating)?

58

1  A.   That's correct.

2  Q.   Where I just marked?

3  A.   That's correct.

4  Q.   Kind of parked what would be on the crosswalk of the

5  sidewalk running parallel to Fourth Street going across

6  Hickory?

7  A.   Actually, I believe he was a little further south than

8  that.  I'm trying to think.  I'm not sure if that section of

9  Fourth Avenue has a fairly large grassy area between the

10  sidewalk or not.  It was down away from the intersection a

11  little ways, so it has a large section of grassy area, then

12  he's probably this way off the sidewalk or in this area.

13  Q.   On Fourth Avenue at least, I was there Sunday night, on

14  parts of Fourth Avenue there's a large grassy area between the

15  sidewalk and the actual curb of Fourth Avenue, correct?

16  A.   Okay.  I don't honestly know for sure.  I believe that's

17  the way it is, I'm not a hundred percent sure on that.

18  Q.   When you pulled up, you said you activated your take-down

19  lights?

20  A.   That's correct.

21  Q.   Those are spotlights that are up on the light rack that's

22  on the top of your vehicle?

23  A.   That's correct, and point forward.

24  Q.   Did you activate your flashing lights?

25  A.   No, I did not.


59


1  Q.   When you approached Deputy Sorensen, he gave you the bag

2  with the rifle in it, correct?

3  A.   That is correct.

4  Q.   And indicated that Mr. Lewis had told him, him being

5  Officer Sorensen, that Mr. Lewis had found the rifle while

6  going through the garbage?

7  A.   That's correct.

8  Q.   You didn't accept that explanation at face value?

9  A.   It's a nice rifle.  Warren County definitely is known for

10  hunting, a lot of people in Warren County hunt.  And for

11  someone just to throw a rifle that was kept the way it was, no,

12  I don't see where someone would throw that away.

13  Q.   So you didn't accept that explanation as to how Mr. Lewis

14  came into possession of the rifle?

15  A.   That's correct.

16  Q.   You wanted to investigate a little bit further about what

17  was going on with that rifle?

18  A.   Initially I wanted to make sure it wasn't loaded and

19  stolen.  And then I wanted to know, yeah, where did you get it,

20  where did it come from.

21  Q.   You wanted to keep Mr. Lewis around while you were

22  checking to see if it was stolen; if it came back stolen, you

23  were going to take him into custody for possessing a stolen

24  rifle?

25  A.   I didn't tell him at anytime that he had to stay there.


60


1  Q.   I'm not asking what you told him, I'm asking what you

2  were thinking?

3  A.   Well --

4        MS. SANNER:  Objection as to relevance, your

5  Honor -- what he was subjectively thinking is not relevant.

6        THE COURT:  It's an objective standard, I'll let you

7  ask the question, go ahead.

8        THE WITNESS:  Well, you know, as I said, I wanted to

9  make sure it wasn't stolen.  I guess if it were stolen, I

10   wanted to at least catch the person who had it.

11   BY MR. PATTON:

12   Q.   And Mr. Lewis was the person who had it?

13   A.   That's correct.

14   Q.   So your intention was to run the serial number to see if

15   it was stolen, correct?

16   A.   That's correct.

17   Q.   If it was stolen, you were going to arrest Mr. Lewis?

18   A.   First of all, I would have questioned him, I would have

19   asked him about it.  If it came back stolen, I would have read

20   him his Miranda rights, questioned him about the weapon, then I

21   would have arrested him for possession of stolen property.

22   Q.   When you were on the scene, you actually frisked Mr.

23   Lewis and Mr. Sumrow, didn't you?

24   A.   What I did, I was talking to Deputy Sorensen.  As I was

25   walking back, I said you know, we probably ought to check, make

61

1   sure these guys don't have any other weapons.  They both said

2   go ahead, we don't have anything.  We did a quick pat-down on

3   both of them and they didn't have anything.

4   Q.   You were going to frisk them down whether they said go

5   ahead or not, correct?

6   A.   You know, I always try and get consent.  But for officer

7   safety, yeah, I probably would have.

8   Q.   Let me understand the situation.  You're at the corner of

9   Hazel and Fourth Street?

10  A.   Fourth Avenue.

11  Q.   Correct.

12  A.   That's correct.

13  Q.   Deputy Sorensen's marked police car is sitting there,

14  correct?

15  A.   On Hazel, correct.

16  Q.   With its lights flashing?

17  A.   That's correct.

18  Q.   And Deputy Sorensen is in full uniform, right?

19  A.   Right.

20  Q.   You have your marked vehicle, you pull up with the

21  take-down lights shining on Mr. Lewis and Mr. Sumrow, correct?

22  A.   And Deputy Sorensen, correct.

23  Q.   You're in full uniform, correct?

24  A.   That's correct.

25  Q.   Deputy Sorensen had taken the rifle from Mr. Lewis,

62

1  correct?

2  A.    That's correct.

3  Q.    You were checking to see if it was stolen, correct?

4  A.    Uh-huh.

5  Q.    You told Deputy Sorensen we need to pat these guys down

6  for safety?

7  A.    I said we probably should, I didn't say we need to, I

8  said we should probably pat these guys down.  At which time

9  they interjected go ahead, we don't have anything.

10  Q.    You're just throwing out hypotheticals to Deputy Sorensen

11  maybe we should do this, maybe we should do that?

12  A.    Basically, yeah, I think it would be a good idea to make

13  sure these guys don't have any weapons.

14  Q.    You were going to do that?

15  A.    That's correct.  But we got their consent prior to just

16  doing that.  They said go ahead.

17  Q.    As they're standing there with police cars and police

18  lights, with emergency lights flashing, correct?

19  A.    The lights were on, they were on for safety reasons.

20  Q.   And then they were frisked, correct?

21  A.   Yes, they were patted down.

22  Q.   You didn't find any weapons?

23  A.   No.

24  Q.   And you called in the serial number from the firearm?

25  A.   That's correct.


                                    63


1  Q.   You had to wait a little bit of time before you had an

2  answer?

3  A.   That's correct.

4  Q.   You wanted to question Mr. Lewis a little bit more about

5  where he found the item, correct?

6  A.   I did not at that time go over.  I was standing at the

7  vehicle.  I secured the firearm in the vehicle, I locked the

8  doors, basically, I got the response.  I mean our dispatcher

9  unless she's really busy, she's fairly quick about everything.

10  This whole incident only took, from the time that I got there

11  at 13 minutes after 10 until I took him into custody, like I

12  said, it was 17 minutes.  So during that 17 minutes, she had

13  checked to see if the firearm was stolen, checked to see if he

14   was wanted on NCIC and cleaned.  So she did all of that fairly

15   quickly.

16   Q.    When you're calculating the 17 minutes, your report on

17   the front page has a place where it says dispatched officer,

18   then has the date of 3/28/2005 and a time of 2213, is that the

19   time you got dispatched?

20   A.    No, the time I got dispatched is going to be right

21   underneath where it says description.  It's going to say date,

22   3/28/2005.  Then it will say 2211.  That's the time that I got

23   dispatched.  I had arrived there at 2213, which is two minutes

24   after I was dispatched.

25   Q.    Okay.  Then where is it that says that the encounter


64


1   ended at 2230?

2   A.    In the comments section right underneath the location, it

3   tells the serial number of the firearm that I ran, the time I

4   seized that.  Where he had claimed to have found it, and then

5   one in custody at 2230 hours.  And then it also states the time

6   that I had cleared that location and was in route to our

7   station.

8  Q.    Before you ran the serial number, did you personally ask

9  Mr. Lewis questions about how he came into possession of the

10  firearm?

11  A.    No, I did not.

12  Q.    After you got a call back saying the firearm was not

13  reported stolen or had not been reported stolen, you then went

14  and questioned Mr. Lewis?

15  A.    Yeah, I wanted to ask him where he got it.  If it's not

16  stolen -- I just wanted to see if he'd tell me that same thing

17  that Deputy Sorensen told me, that he found it in the garbage.

18  Like I said, you know, I don't see someone in Warren County

19  just throwing that away.

20  Q.    Well, when you then questioned Mr. Lewis further, he

21  again told you that he found it in the garbage, correct?

22  A.    That's correct.  There was a little discrepancy as to

23  where in the garbage he found it, but he told me he found it in

24  the garbage.

25  Q.    Just out of curiosity, at any time since March 28, 2005,


65


1  has anybody in Warren reported a 30-30 level action rifle being

2  stolen?

3  A.   No, they haven't.  Although, hunting season is getting

4  closer, it's possible that they might.  They might have just

5  not noticed it missing up to this point.

6       THE COURT:  When is hunting season down in your neck

7  of the woods?

8       THE WITNESS:  Rifle season starts -- I'm trying to

9  think, it would be right after Thanksgiving.  It would be the

10  Monday after, I believe.  So about a month, little over a month

11  away, I guess.

12       THE COURT:  Are you talking about deer season?

13       THE WITNESS:  Rifle deer season, that's correct.

14  BY MR. PATTON:

15  Q.   Is there anything in season for March?

16  A.   Not that I'm aware of.  Other than maybe small game,

17  but -- well, that's around turkey season, I believe, spring

18  turkey.  Somewhere in the area of spring turkey and I believe a

19  little bit of small game.

20  Q.   While you were asking Mr. Lewis these questions about

21  where he found the gun, had you at any point up to then asked

22  him who he was?

23  A.   Yeah, I asked him what his name was.  At one point he had

24  told me it was Barry Wayne Lewis and he gave me his date of

25  birth.  I asked him if he had any type of ID through any state,

66

1  whether it be Pennsylvania or somewhere else.  He told me no

2  several times.

3  Q.   After you put the rifle in your vehicle and got a call

4  back from your dispatcher that the firearm was not stolen and

5  you went back to speak with Mr. Lewis, where was Mr. Lewis at

6  that time?

7  A.   At that point he's going to be -- he's going to be, well,

8  it would be the south side of the intersection of Hazel and

9  Fourth.  He'll be to the southeast corner of Hazel Street.

10  It would be right here, (indicating).

11  Q.   If you touch the screen --

12  A.   Right in this area here, (indicating).

13  Q.   Is Deputy Sorensen standing with him there?

14  A.   Speaking to him there, correct.

15  Q.   Still within your take-down lights shining?

16  A.   That's correct.

17  Q.    With Deputy Sorensen's car right there in front of him

18  with his lights activated as well?

19  A.    I don't believe his take-down lights were activated, but

20  his emergency lights were activated.

21  Q.    That's where you are asking Mr. Lewis questions, some

22  more questions about where he found the rifle, correct?

23  A.    That's correct.  Also, on the other side of the

24  intersection over here, he walked across because Dawn Sumrow

25  walked up this way, he walked over, over into here and was

67

1  talking over there.  Deputy Sorensen and I walked over with

2  him.

3  Q.    When was that?

4  A.    It was prior to me finding out he was wanted from

5  California.  When I found out he was wanted from California,

6  there was a warrant issued from there, then I placed him into

7  custody, took him to my car.

8  Q.    Was it prior to asking him questions about where he found

9  the rifle?

10  A.    Throughout this whole thing we did.  I mean, the whole

11  situation just didn't sound right.

12  Q.   This is my question.  Where was he standing at the time

13  you started asking him questions about where he found the

14  rifle?

15  A.   When we started?

16  Q.   Yes.

17  A.   He was in between both patrol vehicles.

18  Q.   You had asked him some questions about where he had found

19  the rifle, you then went to call in the serial number, correct?

20  A.   That was the first thing when I got there.  Deputy

21  Sorensen handed me the rifle, I cleared the rifle, walked back

22  to my patrol vehicle, called in the serial numbers.  Placed the

23  firearm in the front seat of my patrol vehicle and locked the

24  doors.  Got the response that it was not stolen.  Then I walked

25  back.


68


1  Q.   During the entire time the events you just described

2  transpired, Mr. Lewis is standing where you had marked on the

3  map, on the southeast corner of Fourth and Hazel, correct?

4  A.   That's correct.

5   Q.   Where he was, basically, where he was when you pulled up?

6   A.   That's correct.

7   Q.   And that's where he was standing while you were asking,

8   when you came back from your vehicle and then started asking

9   him some more questions about where he had found the rifle?

10   A.   That is correct.

11   Q.   And he gave you the same answer, saying that he found it

12   in the trash, correct?

13   A.   Yes, the location was different, but finding it in the

14   trash is the same.

15   Q.   He's still standing in the same location?

16   A.   That's correct.

17   Q.   You also ask him his name, correct?

18   A.   That's correct.

19   Q.   While he's standing at the same location?

20   A.   Right.

21   Q.   Then you call in his name?

22   A.   That's correct.

23   Q.   Why did you call in his name?

24   A.   Check for local wants and warrants.

25   Q.   And what were you going to do if a warrant came back?

1   A.   Take him into custody.

2   Q.   You wouldn't be able to take him into custody if you let

3   him walk away and he had disappeared while you're waiting to

4   get the results of a warrant check, correct?

5   A.   Yes, but he didn't.

6   Q.   You weren't going to let him if he tried to, were you?

7   A.   I didn't tell him that he couldn't.  As I said, as far as

8   what I would have done if he started walking away, I may have

9   said, hold on a minute, but he wasn't concerned with leaving.

10   He wanted to get the firearm back, he was staying there to see

11   if I would give it back.  I told him initially it's basically

12   lost property.  I'm going to keep it, I'm going to secure it.

13   When the owner or if the owner calls in and requests or reports

14   it stolen, then I'm going to return it.

15   Q.   After he had given you his name, he walked across Hazel

16   Street?

17   A.   That's correct.

18   Q.   You and Deputy Sorensen walked with him?

19   A.   Him and Terry Sumrow actually walked across the road when

20   Dawn Sumrow was walking up the sidewalk.  She was actually

21  walking north on Hazel Street.  Then Deputy Sorensen and I just

22  walked over behind them.

23  Q.    This was after he had given his name, after you were

24  waiting for the results of the warrant check?

25  A.    We weren't over on the other side of the road for very

70

1  long.  We were there for a few minutes, we talked to Dawn for a

2  few minutes, then our dispatcher said that he was wanted out in

3  California, so we took him into custody.

4  Q.    Did you get that through the radio on your person?

5  A.    This portable radio, (indicating).

6  Q.    You were standing next to Mr. Lewis when that came back

7  saying he was wanted?

8  A.    That's correct.

9  Q.    When you frisked Mr. Lewis, he was standing over on the

10  east side of Hazel Street, is that correct?

11  A.    We had not walked across the street yet, that's correct.

12        MR. PATTON:  May I have a moment, your Honor.

13        THE COURT:  Sure.

14        MR. PATTON:  Those are my questions, your Honor.

15        THE COURT:  Do you have anything else of this

16  witness?

17        MS. SANNER:  Very briefly, your Honor.

18              REDIRECT EXAMINATION

19  BY MS. SANNER:

20  Q.    Officer Gulnac, you said it took you two minutes to get

21  to the scene after receiving the call on the radio?

22  A.    That's correct.

23  Q.    Was there a faster way of getting there?

24  A.    I probably could have ran there faster than taking a car.

25  I actually had to go out the back door of the police


                            71


1  department, get in the car, start the car and go there.  Where

2  if I were to walk over or run over, I could go out the front

3  door, it's two blocks away.

4  Q.    So your sense was this wasn't an immediate arrest

5  situation that warranted you speeding to that scene?

6  A.    No.  At no time did I activate my lights or siren to get

7  there.

8  Q.    The police station was about two blocks from the scene?

9   A.    That is correct.  On the map here you have Poplar Street,

10   then you'll have Hickory Street -- the police department is

11   right there.  Just down one block, it would be Third Avenue.

12   It goes Second, Third, Fourth, Fifth, all away up to Seventh.

13   It would be at the corner of Hickory and Third.

14   Q.    When you approached, you took the weapon from Officer

15   Sorensen and immediately did a check to see if it was stolen?

16   A.    Immediately I checked to see if it was loaded.  That's

17   the first thing I did, I wanted to make sure it wasn't loaded.

18   Then I checked to see if it was stolen.

19   Q.    When you returned back to the scene, that's when you

20   asked the defendant who he was, and you then said maybe we

21   should frisk them?

22   A.    As I stated, I was talking to Deputy Sorensen.  I said,

23   you know, we probably ought to pat these guys down for officer

24   safety.  Both of them said, go ahead, we don't have anything.

25        THE COURT:  Answer the first part of the question.


72


1   When did you ask him who he was, if you remember?

2        THE WITNESS:  It appears here that I asked him when

3   I got back over there what his name was.  Then I spoke to him

4   for a few minutes.  Then did the NCIC and clean check -- for

5   wants and warrants.

6   BY MS. SANNER:

7   Q.    He remained in the area because he wanted the gun back?

8   A.    I'm assuming that's why he stayed there.

9   Q.    He asked for it back, didn't he?

10  A.    Yes, several times.

11  Q.    He asked if he could hold onto it until someone claimed

12  it?

13  A.    That's correct, he wanted to keep it and have either them

14  or me contact him, he would return it to the owner if they

15  called for it.

16  Q.    But you didn't arrest him for the weapon or anything like

17  that?

18  A.    No.

19  Q.    You didn't believe his story that he had just found it?

20  A.    No.

21  Q.    Do you see him in court today?

22  A.    Yes, I do.

23  Q.    And can you identify something that he's wearing?

24  A.    He's wearing an orange and white jumpsuit.

25        MS. SANNER:  Your Honor, may the record reflect the


                                73


1   officer has identified the defendant?

2         THE COURT:  It does.

3         MS. SANNER:  I have nothing further, your Honor.

4         THE COURT:  I have one question.  You said you

5   pulled up, you couldn't quite remember whether Deputy Sorensen

6   was just stopping his vehicle or just getting out of his

7   vehicle, is that right?

8         THE WITNESS:  That's correct.  I don't know if the

9   vehicle was actually in motion or if he was just stopping and

10   getting out.

11        THE COURT:  Did you pull up in relative close

12   proximity to his vehicle?

13        THE WITNESS:  The actual distance I don't recall.

14   I would say it would be -- 5, 8, maybe even 10 feet.  I wasn't

15   bumper to bumper by no means.

16        THE COURT:  Based on the sequence of events, in

17   terms of you pulling up and observing him just stopping or

18  getting out of his car, would you have been visible to

19  pedestrians on the street there prior to the time that gun was

20  handed over?

21       THE WITNESS:  I don't recall seeing them walking

22  down the sidewalk.  I recall seeing the defendant in this case,

23  at that time it was the gentleman in the light blue coat,

24  handing the rifle to -- well, it was a bag at the time, I

25  didn't even know it was a rifle, to Deputy Sorensen.


74


1       THE COURT:  Where were you when that happened, I'm

2  trying to get the sequence of events?

3       THE WITNESS:  I probably would have been, as far as

4  this map goes, obviously, it's not to scale or anything, I

5  would have been over in this area somewhere.  I mean, I wasn't

6  there yet.  I was getting there.  So I would have been a house

7  or two away, able to see what was going on.

8       THE COURT:  Did you have your lights on at that

9  time?

10       THE WITNESS:  Just my headlights.

11       THE COURT:  All right.  Thank you, you're excused,

12  sir.

13        MS. SANNER:  The government has no further

14  witnesses, your Honor.

15        THE COURT:  You have one witness?

16        MR. PATTON:  Yes.

17        THE COURT:  How long is this person going to be?

18        MR. PATTON:  I would say he's going to be at least a

19  half hour.

20        THE COURT:  We're going to take a lunch break.

21  We'll come back and we'll start at 10 to one.

22        (Luncheon recess from 11:50 a.m.; until 1:05 p.m.)

23        THE COURT:  Mr. Patton.

24        MR. PATTON:  Your Honor, we do not have any

25  witnesses to put on.  I did, though, after speaking with Ms.


75


1  Sanner, I marked the handwritten map that we were referring to

2  throughout the hearing as Defendant's Exhibit A, I would ask

3  that be admitted.

4        THE COURT:  That's admitted.

5        MS. SANNER:  I would offer Government's Exhibit 1

6    into evidence as well.

7        THE COURT:  Which one is that?

8        MS. SANNER:  The gun.

9        THE COURT:  Do you have a picture of it?

10       MS. SANNER:  I can get one.

11       THE COURT:  I'm not exactly sure how we're going to

12   ship that to the Third Circuit, can you take a picture of it?

13       MS. SANNER:  We can do that.

14       THE COURT:  Mr. Patton, do you have any need that

15   the actual gun be submitted as an exhibit?

16       MR. PATTON:  No, your Honor.

17       THE COURT:  All right.  Just by way of post-hearing,

18   is there anything you want to tell me by way of conclusion,

19   legal as applied to the facts?

20       MS. SANNER:  Just argument.

21       THE COURT:  That's what I mean.

22       MS. SANNER:  Yes.  The government's position is that

23   this was a consensual encounter.  Obviously, the Fourth

24   Amendment does not proscribe voluntary cooperation.  In fact,

25   voluntary cooperation is an important tool of law enforcement.

76

1  A seizure doesn't occur every time an officer approaches to ask

2  a few questions.  Even if their lights are on.  One officer

3  approached the defendant.  He approached on foot, he was in

4  public, on a city street, no guns drawn.  There was no

5  intimidating movement, no show of force.

6        THE COURT:  What about the car blocking his path

7  going across the street with its lights on, wouldn't that

8  suggest you can't at least go that way?

9        MS. SANNER:  It might suggest that he had to go

10  around the police car to continue through the intersection,

11  which in fact is what the defendant proceeded to do.  The

12  officer, as he was proceeding through the intersection, said

13  what do you have, and the defendant said it's a rifle and

14  handed it over.  There was no stop, there was no frisk.  It was

15  here, it's a rifle, and I was going to turn it into the police

16  station.  The encounter here was consensual, and the Fourth

17  Amendment is not implicated.

18        The defendant doesn't argue that any passage of time

19  turned it into a stop.  In fact, the testimony today showed

20  that the officer quickly discovered their primary concern was

21  that the weapon was not stolen.  They didn't detain the

22  defendant then, the defendant hung around because he wanted to

23  keep the gun.  He asked for it, he hoped to keep it, he

24  wondered if he could keep it until someone came to claim it.

25  The officers didn't believe his story.  They didn't see that it

77

1  was trash night and there were a lot of garage bags around,

2  maybe he did just pull it out of the trash.  In fact, it

3  appeared that the garbage bags were pretty much farther up.

4       They smelled something funny, they asked the

5  defendant who he was, and he said he had no ID.  No ID on him.

6  All his ID had been stolen and he could offer them nothing.

7  Finally he told them his name.  And when he told them his name,

8  that's when the officers were able to perform a check on the

9  name and uncover the extraditable warrant out of California.

10  That's when the arrest happened.

11       As far as the east, west contradiction.  Neither

12  officer's testimony contradicts anything in their reports.

13  They were responding in a moment, seven months later, to a

14  hand-drawn schematic by opposing counsel.  Time has passed, I'm

15  sure the officers did not consider it relevant, whether it was

16  on the east side or the west side.  What they considered at the

17  time was they had a guy walking down the street apparently

18  trying to conceal a gun.

19          Even if the encounter was not consensual, they had

20  reasonable suspicion to stop him.  If the officer had not

21  stopped the defendant here, he would have been derelict in his

22  duties.  He observed specific articulable suspicious behavior.

23  He saw the defendant carrying a rifle, close to his body,

24  walking straight armed, partially concealed in a bag, in a rug,

25  or actually fully concealed, it just like looked like a rifle.


                                    78


1          THE COURT:  Let me ask you a question just

2   hypothetically.  If instead of what he saw, that is the

3   defendant walking with a firearm positioned to his body in the

4   manner which the officer testified, what if the defendant had

5   been walking across the street with a gun in a typical cradle

6   position, your safety position, as you're just carrying it, it

7   wasn't in a bag at all, he was just carrying the gun and

8   walking across the street essentially for all the world to see.

9   All other circumstances being the same, same time at night,

10  whatever, would the officer have had reasonable suspicion to

11  stop him?

12          MS. SANNER:  I believe so, even under those

13  circumstances.  Because it's 10 o'clock at night, in a city

14  downtown, not hunting season, it would be reasonable to fear

15  that criminal activity might be afoot under those

16  circumstances.  Here we have more than that.  We have not just

17  a city street late in the evening in March, we have him with a

18  gun in a bag close to his body, using his companion as a shield

19  as they try to pass the officers.

20          There was reasonable suspicion based on that stop.

21  Looking at the whole picture, reasonable suspicion can be based

22  on entirety legal behavior, just like your Honor's example

23  would be.  And great deference is given to the officer's

24  experience in law enforcement in that regard.  I think it would

25  have triggered a concern even if the gun was, as you described,

79

1  cradled in his hands, given the circumstances of the evening

2  situation and where he was in the city.

3          THE COURT:  Would it matter if he was carrying it in

4    a regular gun case, just carrying it as it was intended to be

5    carried, but it was apparent it was a gun case, there was a gun

6    in it, would the officer have had reasonable suspicion to stop

7    him under those circumstances?

8         MS. SANNER:  Again, you're not looking for a

9    consensual encounter?

10        THE COURT:  I'm on the regs part of it now.

11        MS. SANNER:  In that circumstance, again, there are

12   conceivable honest uses you could have had for carrying a gun

13   like that in the street.  Maybe under those circumstances

14   where, given the number of rifles in Warren --

15        THE COURT:  And the fact they have to be transported

16   somehow from place to place?

17        MS. SANNER:  They have to be transported somehow,

18   I suppose they could need repaired or cleaned or something to

19   that effect, but it was late at night.  No, I think that's a

20   little bit different.  And clearly not what we had here.  I

21   think it's the manner in which it was concealed, the way that

22   he used both his body and his companion's body in an effort to

23   shield it from the officer's view that really caused a

24   reasonable suspicion in this case.

25          Again, this is not like the Ubiles case, I'm

_____


80


1   guessing on how to pronounce that, where the officers were

2   responding to an corroborated anonymous tip.  And then

3   proceeded to pat-down the person at issue.  This is a situation

4   where the officer observed himself, hey, there's a guy walking

5   down the street with a gun, called for backup saying the same

6   thing.  And when asked, the defendant offered him the gun.

7          THE COURT:  How is this case like Valentine?

_____

8          MS. SANNER:  Valentine I think makes a good point in

_____

9   that officers are allowed to ask questions of anyone, and gun

10  owners are no exception.  I think that's the most important

11  thing that we can take from Valentime.  The government's

_____

12  position is notwithstanding where the car was or that the

13  lights were on, this was in essence a consensual encounter.

14  The officers would have responded differently if it were not

15  consensual.  They would have had their guns drawn, they would

16  have said stop, police, that's not what happened in this

17  situation.  They said hey, what do you have in the bag.  That's

18  a consensual encounter.

19        THE COURT:  I hesitate to ask you this, this is my

20  last question.  To qualify the strength of your two arguments,

21  have you put most of your eggs in the consent basket or most of

22  your eggs in the reasonable grounds basket?

23        MS. SANNER:  I would distribute my eggs equally

24  between the two baskets.

25        THE COURT:  That was a good answer.


                            81


1        MS. SANNER:  I think that either applies.  There was

2  ample reasonable suspicion in this case.

3        THE COURT:  All right, let me hear from Mr. Patton.

4        MR. PATTON:  Your Honor, I know Ms. Sanner's arguing

5  for her client the best she can.  But to try and really argue

6  that this is a consensual encounter just flies in the face of

7  the facts.

8        THE COURT:  I want to hear about the reasonable

9  grounds part of it?

10        MR. PATTON:  Your Honor, the testimony you have is

11  that the officer saw an object.  He didn't know what the object

12  was.  He saw something wrapped in a blanket, inside a garbage

13  bag, with apparently part of the object still wrapped in the

14  blanket sticking out of the garbage bag.  He doesn't even know

15  if it's a firearm or not.  As far as was there some kind of

16  attempt to conceal it, number one, if you're walking down a

17  street with a companion and your companion happens to be closer

18  to a car in a intersection than you are, your companion is

19  going to block the driver's view of you.  There is nothing

20  inherently suspicious in that.  There is nothing suspicious

21  about two men who are walking together as they approach the

22  street, walking across the street together and continuing to

23  walk down the sidewalk on the other side of the street

24  together.  I mean -- as far as trying to conceal the weapon

25  from Deputy Sorensen, according to his own testimony, Mr. Lewis


82


1  is carrying the gun on the side of Mr. Lewis's body that is

2  facing Deputy Sorensen's car.

3          THE COURT:  Let me ask you this.  The upshot of his

4  testimony, as he viewed it, that it was his opinion -- he

5   didn't know, he suspected it might be a weapon.  But whatever

6   it was, he thought there was a conscious attempt to hide it

7   from him, given the manner in which he was walking.  Let's just

8   assume for the sake of argument that's all true.  That there

9   was a conscious attempt.  There's a line of cases that deal

10  with nervousness, or furtive behavior, insofar as it informs on

11  the question of reasonable suspicion.  Put that into the mix,

12  is there reasonable suspicion?

13        MR. PATTON:  There is not reasonable suspicion, your

14  Honor.  I would say that what Deputy Sorensen had after Mr.

15  Lewis and Mr. Sumrow walked across the street, was a classic

16  example of inchoate and unparticularized suspicion or hunch.

17  Which the Terry case says is not sufficient to justify a stop.

            _____

18  Now, certainly if Deputy Sorensen wants to then engage in a

19  truly consensual attempt to talk with Mr. Lewis, he can do

20  that.

21        THE COURT:  I steered you off that first point, but

22  let's go back to it.  What did he do, in your view, that

23  rendered the initial encounter, the very initial encounter

24  where he met with this fellow, non-consensual, what were the

25  circumstances that made it coercive?

83

1       MR. PATTON:  The testimony is that Mr. Lewis and Mr.

2   Sumrow were stepping off the sidewalk onto Hazel Street to

3   cross Hazel Street.  Deputy Sorensen pulls the car into the

4   crosswalk, in his words, 10 to 15 feet in front of them,

5   activates the lights.  It's a marked police car.  He gets out

6   in full uniform and approaches them to question them.  I would

7   submit that there is no reasonable person under those

8   circumstances that would believe that this is just a police

9   officer who wants to come up and see if you want to talk with

10   him or not.  If it was truly going to be just a consensual

11   encounter, if that's all you want to do, there is no reason to

12   stop the car, number one, in the middle of the sidewalk; number

13   two, in the middle of the road, so that you have to turn the

14   lights on, so other cars can avoid you.  The testimony is there

15   is room on Hazel Street, if Deputy Sorensen had chosen to do

16   so, that he could pull up, parallel park along the side of the

17   curb, therefore, not creating any kind of traffic hazard, he

18   wouldn't have to turn his lights on.  He can get out of his

19   police car, and at that point walk up to Mr. Lewis and say hey,

20  you mind answering some questions.  Or just say hey, what do

21  you got in the bag.

22          Under those facts, that would be a consent encounter

23  that someone could look at and say, okay, that's good police

24  work, he saw something that peaked his interest, so he's going

25  to check it out.  It's not enough for him to stop, to forcibly

84

1  stop somebody, but he can see if they want to talk.  But

2  pulling your car into the middle of the road, directly in front

3  of the person, the pedestrians pathway, even as Deputy Sorensen

4  testified, they would have had to walk around his car, outside

5  of the crosswalk, to get to the other side of Hazel Street.

6  And if Deputy Sorensen is turning the lights on for public

7  safety reasons, that's not information that Mr. Lewis or Mr.

8  Sumrow have as they're walking down the street.

9          What they have, you have to view it as a reasonable

10  person, what a reasonable person sees, is a police officer just

11  pulled their car directly in front of us, in our path to stop

12  us from walking where we're walking, puts his lights on, which

13  is a show of his official authority.

14          I fail to understand how any reasonable person under

15    those circumstances would view that encounter as consensual in

16    nature.

17          THE COURT:  So it's your position they were in

18    custody, he was in custody?

19          MR. PATTON:  He was seized.

20          THE COURT:  He was seized?

21          MR. PATTON:  Correct.

22          THE COURT:  Is it your position he had to be

23    Mirandized at that point?

24          MR. PATTON:  Before they start asking questions that

25    they know would reasonably --


                                85


1          THE COURT:  Like what's your name?

2          MR. PATTON:  Like where did you get the rifle.  We

3    think the rifle is stolen, we're trying to find out where you

4    got it from.

5          THE COURT:  But the critical fact that got the ball

6    rolling for the charge wasn't so much the rifle as it was his

7    identity?

8            MR. PATTON:  I completely disagree with that.  If

9   there had never been a warrant for Mr. Lewis out of California,

10  he still had a conviction that made it illegal for him to have

11  possessed a weapon, we'd be sitting right here.  His name and

12  the fact there was a warrant for him out of Calfornia has

13  absolutely nothing to do with the federal charges --

14           THE COURT:  It's a felon in possession, isn't that

15  the charge?

16           MR. PATTON:  He has convictions other than the

17  California conviction that makes it illegal for him to possess

18  the weapon.  So I strongly disagree.

19           THE COURT:  It's his identity and, therefore, the

20  background check that would have revealed other convictions,

21  wherever they may have been, that made it illegal for him to

22  possess the rifle because he wasn't charged with possessing a

23  stolen rifle, right?

24           MR. PATTON:  Because nobody can show that it was

25  stolen.


                                86



1            THE COURT:  Okay.

2        MR. PATTON:  The fact he hasn't been charged with

3   possessing a stolen rifle is the only reason he wasn't charged

4   with that is because -- nobody could prove, either the federal

5   government, nor Warren County, that the rifle was stolen.  And

6   for our purposes today, the evidence that we're seeking to have

7   suppressed, number one, is the weapon itself.  If he's seized

8   when Deputy Sorensen pulls the car up, right up in front of him

9   in the crosswalk, puts the lights on and comes out, then Deputy

10  Sorensen's questioning of hey, what's in the bag, Mr. Lewis's

11  response to that show of authority, that's a violation of his

12  Fourth Amendment.  The firearm has to be seized.  And all

13  statements after that are fruit of the poisonous tree.

14        THE COURT:  Including what's your name?

15        MR. PATTON:  Everything.  Now, when you go to trial,

16  you can't ask that somebody's identity be suppressed because

17  there's case law talking about that fact.  So all we can do in

18  this motion, we're asking you to suppress the physical item of

19  the firearm and --

20        THE COURT:  The statements back at the police

21  station?

22        MR. PATTON:  And the statements on the scene that he

23  found it in the trash, all of those statements.

24      THE COURT:  If there's no gun, there is no charge,

25   right -- I mean, theoretically, if the gun is suppressed, it's

87

1   done?

2      MR. PATTON:  If the gun is suppressed, the

3   government is not going to be able to prove, number one, it's a

4   firearm, that it's traveled in interstate commerce.

5      THE COURT:  I think I have the lay of the land.

6      MR. PATTON:  Okay.

7      THE COURT:  Unless there's one last point you want

8   to make?

9      MR. PATTON:  If you can't win a motion to suppress

10   on the claim there's not reasonable suspicion in this case, you

11   can't win.

12      THE COURT:  Well, you kind of put the ball in my

13   court there, haven't you, Mr. Patton.  Do you have anything

14   else you want to say?

15      MS. SANNER:  Yes, extremely short, your Honor.  Just

16   that the concept that an encounter couldn't be consensual and

17   that the defendant would be seized because of the angle at

18   which the officer parked is extraordinary to me.

19        THE COURT:  Let me ask you this.  The test for

20   whether someone is seized, otherwise stated whether an

21   encounter was consensual, in an open space, as opposed to a bus

22   or a confined area, is whether or not that person would have

23   reasonably believed they were free to leave and/or not say

24   anything, just walk away?

25        MS. SANNER:  Right.


88


1        THE COURT:  And you have to consider the totality of

2   the circumstances.  Does it inform my decision at all that the

3   defendant would have seen this officer two minutes before, and

4   then would have concluded that he followed him for some period

5   of blocks, and then pulled in front of him when he was trying

6   to cross the street?

7        MS. SANNER:  I think the testimony was that the

8   officer didn't follow him, he actually went around the block,

9   lost sight of him and then encountered him.

10       THE COURT:  And caught up with him eventually?

11       MS. SANNER:  As far as the freedom to leave, I think

12   another thing that would inform your Honor that is he kept

13   walking.  When the officer pulled up in his car, if he was

14   detained or seized at that moment, you would think he would

15   have stopped.  But no, he continued on his path to where he was

16   going to the other side of the street.

17        THE COURT:  Would it have informed an objectively

18   reasonable person when the sister of his companion showed up

19   when he went to meet her or greet her he was accompanied by

20   both policemen, would have informed his decision as to whether

21   he was free to leave?

22        MS. SANNER:  I think at that point there was a

23   decent amount of wandering about the area, what the testimony

24   was, from one side of the street to the other.  People were

25   approaching.  I guess if I was an objectively reasonable person


89


1   at that point and I felt the officer was following me, there

2   might be a sense of some seizure there.  But, again, he was

3   never told that he was under arrest.  He was always free to

4   leave.  And the sense was that he was hoping to get the gun

5   back.  If your Honor looks at this as reasonable suspicion and

6   considers him seized, then it would fly in the face of reason

7   to say that there wasn't reasonable suspicion to pull over the

8   car and stop the defendant the way that they did.  This wasn't

9   an inchoate hunch.  This was an articulated specific reason,

10  I think I've seen a guy trying to conceal a gun.  Which he

11  relayed to the operator to try and get backup.  So Officer

12  Gulnac heard him say, you know I'm following a guy, I think

13  he's carrying a gun three-feet long, next to his body, wrapped

14  up, and moving in a way that would conceal it, not only from

15  the officer, but also from any other passersby, blocks from

16  where the police station was.  So based on his physical

17  movement, the time of day, the way the weapon was concealed,

18  clearly the officer had a particularized reason to stop him.

19  Again, a reasonable suspicion can be grounded on completely

20  legal activity.  He could have had a weird shaped object and

21  maybe it wasn't a gun.  But here what you look at is what the

22  officer thinks.  Does he have reasonable suspicion and can he

23  articulate that.  Here he not only could, but he did several

24  times.

25          THE COURT:  All right.

1          MR. PATTON:  If I could correct two factual issues.

2     The record does not say Mr. Lewis kept walking when Deputy

3     Sorensen pulled in front of them, turned the lights on, got out

4     of the car.  Deputy Sorensen walked right up to him, asked

5     questions, this happened there on the east side of Hazel

6     Street.  That some period of time after that is when the other

7     things were going on, is when Mr. Lewis's relative came up, he

8     walked over there.  So the testimony wasn't that he got all the

9     way to the other side of Hazel Street because he gets

10     confronted when he's asked for the firearm.

11          The second thing, when the call went out and I asked

12     Officer Gulnac about this specifically, it's in our papers,

13     what Officer Sorensen says is I saw two males, one of them had

14     a rifle or something sticking out of a bag.  It wasn't simply

15     he had a rifle.

16          THE COURT:  All right.  Well, I'm going to take a

17     look at this, get a transcript, I'm going to write an opinion

18     on this, do findings of fact and conclusions of law.  I think

19     by way of papers I have everything I need from both you, I'll

20     try to get something out with some dispatch.

21

22          (Whereupon, at 1:28 p.m., the proceedings were

23   concluded.)

24

25                    - - -


                                91


1              C E R T I F I C A T E

2

3

4

5      I, Ronald J. Bench, certify that the foregoing is a

6   correct transcript from the record of proceedings in the

7   above-entitled matter.

8

9

10

11

12   _____

13   Ronald J. Bench

14

15

16

17

18

19

20

21

22

23

24

25