IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Criminal Action No. 05-24 ERIE |
| | ) |
| BARRY WAYNE LEWIS | ) |

**MEMORANDUM OPINION**

McLAUGHLIN, SEAN J.

Presently pending before the Court is a motion to suppress filed by Defendant Barry Wayne Lewis. Lewis is charged in a one count indictment with being a prohibited person in possession of a firearm in violation of Title 18 U.S.C. § 922(g). For the reasons discussed below, Lewis' motion is denied.

## I. BACKGROUND

The events underlying the instant motion occurred on March 28, 2005. On that date, Lewis, along with his nephew, Terry Sumrow, were walking west on 4th Avenue in Warren, Pennsylvania, at about 10:00 p.m. (Suppression Hearing Transcript (hereinafter, "Transcript"), 10/25/05, p. 5). Warren County Deputy Sheriff K.R. Sorenson was on patrol in Warren that night and, as he stopped his marked patrol vehicle at the traffic light at the intersection of 4th Avenue and Hickory Street, Lewis and Sumrow crossed the street directly in front of his vehicle. (Id. at 6). Sumrow was to the left of Lewis as they walked, placing Sumrow in between Deputy Sorenson and Lewis as the two pedestrians crossed Hickory Street. (Id. at 6, 17-18).

Deputy Sorenson testified that Lewis caught his attention because, as he crossed the intersection, he "appeared to be carrying an item and trying to hide it from [Sorenson's] view." (Id. at 6). Sorenson elaborated that the item in question was about three feet long, wrapped in both a bag

1

and a blanket, and appeared to be of the size and shape of a rifle, but that he never actually saw any portion of the rifle itself. (Id. at 6, 17). According to Sorenson:

> They moved across the street walking, but the person carrying what I thought was a rifle appeared to have a stiff-arm, meaning that his arms weren't moving in a natural manner, swinging back and forth, it appeared to keep his arm stiff to his side.
> \* \* \* \* \* \* \* \*
> So he was carrying the rifle and he had a stiff-arm in walking, trying not to move the weapon at all and using Mr. Sumrow as a shield to block my view of what he was carrying.

(Id. at 6, 12). Sorenson also indicated that Lewis, in addition to concealing the firearm at his side, seemed to be using Sumrow as a shield to prevent Sorenson from seeing the rifle. Sorenson admitted, however, that in any situation where two people are walking together in lock-step, the person closer to the car is likely to block the view of the other person. (Id. at 17-18). Lewis did not, at any point, attempt to shift the rifle from his left side to his right, where his body would have shielded it from Sorenson.

As Lewis and Sumrow cleared the intersection and continued west on 4th Avenue, the light at the intersection turned green and Sorenson proceeded north, turning his head to continue watching the pedestrians. Sorenson lost sight of them for "a couple of minutes" while he circled around the block but regained his visual after merging onto 4th Avenue at a point several blocks behind Lewis and Sumrow. (Id. at 8). As he continued around the block, Sorenson radioed the Warren City Police Department to advise them that he had observed an individual carrying what he thought was a rifle and to request backup.

Once on 4th Avenue, Sorenson followed the subjects at a normal pace with his patrol vehicle for a block or two until they neared the intersection of Hazel and 4th Avenue, at which point he activated the blue and red emergency lights on top of his vehicle and turned onto Hazel. Lewis and Sumrow were just about to step off of the sidewalk alongside 4th Avenue and onto the Hazel Street crosswalk when Sorenson stopped his vehicle in the intersection, perpendicular to the crosswalk. Sorenson testified that:

2

> I believe that my vehicle was probably, probably for the most part in the crosswalk. I'm not sure it was completely in the crosswalk. I want to say it was kind of at an angle.

(Id. at 27). Upon further questioning, Sorenson clarified that, although his vehicle may not have been completely blocking the crosswalk, Lewis and Sumrow would not have been able to continue walking across Hazel "without diverting around [his] vehicle" and leaving the crosswalk. (Id. at 28). Sorenson further testified that he had activated his emergency lights solely for safety reasons, due to his vehicle blocking the intersection; he admitted, however, that he could have safely parked on the side of the road and obviated the need for the emergency lights, but did not do so because he had been in a hurry to speak with Lewis and Sumrow. (Id. at 26-27).

As Lewis and Sumrow continued walking through the crosswalk towards Sorenson's vehicle, Sorenson exited and approached them, asking what was in the bag. Sorenson was wearing his police uniform, but did not draw his gun to approach Lewis. (Id. at 10). Mr. Lewis responded by immediately handing the package to Sorenson, indicating that it was a rifle, and asserting that he had found it in the garbage. (Id.)

About 15 or 20 seconds after Sorenson took possession of the rifle, Warren City Police Officer Brian Gulnac arrived on the scene in response to Sorenson's prior radio for backup. (Id. at 34). Gulnac, like Sorenson, arrived in full uniform and in a marked patrol vehicle. As he pulled in behind Sorenson, Gulnac switched on the bright spotlights on top of his vehicle, known as "take-down lights," and aimed them at Lewis and Sumrow. (Id. at 58). Gulnac did not activate his emergency lights. (Id.)

Sorenson handed the rifle over to Gulnac, who called in the serial number on the rifle to determine whether it had been reported stolen. (Id. at 34). While they were waiting for the results of this call, Gulnac took down Lewis' and Sumrow's names and asked them for identification. Lewis indicated that he had no identification, but provided his correct name. (Id. at 48). Lewis also reiterated that he had found the gun in the garbage, indicated that he had intended to turn it in to police, and queried whether he might be able to keep the rifle if it did not turn up stolen. (Id. at 14).

3

Gulnac suggested to Sorenson that they ought to pat down Lewis and Sumrow for weapons, and Lewis and Sumrow readily assented to the frisk. (Id. at 60-62, 71).

Throughout the interaction between Lewis, Sumrow, and the two officers, Lewis and Sumrow were not restrained or told that they could not leave. (Id. at 59). Rather, they both moved about the area, occasionally crossing the street to speak with some other people who showed up, including Lewis' sister. (Id. at 49-50). According to Gulnac, Lewis remained in the area because he hoped to keep the rifle if it had not been reported stolen. (Id. at 69, 72). Gulnac did note, however, that he and Officer Sorenson followed Lewis closely when he crossed the street. (Id. at 49-50, 69).

After taking down Lewis' name, Officer Gulnac ran a background check for outstanding warrants. This check turned up an extraditable hit for an outstanding warrant in California. (Id. at 14, 48). At that point, Officer Gulnac took Lewis into custody. (Id. at 14, 70).

Lewis was subsequently taken to the City of Warren police station where he was questioned by ATF Special Agent David Farabaugh about the weapon. (Motion to Suppress, p. 2; Response to Motion to Suppress, ¶ 13). Lewis waived his Miranda rights and reiterated to police that he had found the rifle while picking through trash and had intended to take the rifle to his sister's house and have her call the police. (Id.) He also informed Agent Farabaugh that he had been recently released from a state prison in California for assault with a deadly weapon, had a history of mental illness, and had recently returned to Pennsylvania to care for his diabetic mother. (Id.)

## II. DISCUSSION

Lewis' motion to suppress asserts that he was seized in violation of the Fourth Amendment of the United States Constitution. Lewis argues that the circumstances of his encounter with Sorenson constituted a unlawful seizure because Sorenson could not be certain that Lewis was carrying a rifle and, moreover, had no basis for believing that Lewis' purported possession of the

rifle was illegal. Lewis further contends that the statements he made to law enforcement following his seizure should be suppressed as unlawfully obtained fruit of the poisonous tree.

A.

"The Fourth Amendment's requirement that searches and seizures be founded upon an objective justification, governs all seizures of the person, 'including seizures that involve only a brief detention short of traditional arrest.'" United States v. Mendenhall, 446 U.S. 544, 551 (1980) (quoting Davis v. Mississippi, 394 U.S. 721 (1969)). A "seizure" does not occur simply because an officer approaches an individual and asks a few questions. See Florida v. Bostick, 501 U.S. 429, 434 (1991). Rather, "a person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained." Mendenhall, 446 U.S. at 553. If an investigative stop rises to the level of a "seizure," it will pass constitutional scrutiny only where police have a reasonable suspicion, based upon specific and articulable facts, "that criminal activity may be afoot." Terry v. Ohio, 392 U.S. 1, 30 (1968). To demonstrate reasonable suspicion, "[t]he officer must be able to articulate more than an 'inchoate and unparticularized suspicion or "hunch" of criminal activity.'" Illinois v. Wardlow, 528 U.S. 119, 123-24 (2000) (quoting Terry, 392 U.S. at 27).

Consensual encounters, in contrast, occur where a reasonable person would feel free to disregard the police and go about his business or to "decline the officer's requests or otherwise terminate the encounter." Bostick, 501 U.S. at 439. Consensual encounters are important tools of law enforcement and, unlike seizures, need not be based on any suspicion of wrongdoing. Id. at 434. Thus, police officers may approach an individual without reasonable suspicion or probable cause and may question that individual, ask to examine identification, and request consent to search items in that person's possession, provided that the individual would feel free to decline the officer's requests. Id. at 434-35 (citing Florida v. Rodriguez, 469 U.S. 1, 5-6 (1984); INS v. Delgado, 466 U.S. 210, 216 (1984); Florida v. Royer, 460 U.S. 491, 501 (1983)).

Application of the aforementioned principles to the facts before us requires consideration of two sequential questions. First, we must determine whether the encounter between Lewis and

5

Sorenson constituted a "seizure." If we answer that question in the affirmative, we must next determine whether Officer Sorenson acted upon an articulable, reasonable suspicion of criminal wrongdoing in effectuating the seizure.

### i. Was Lewis subjected to a "seizure"?

The fundamental characteristic of a seizure is that a reasonable person would not feel free to "disregard the police and go about his business." Bostick, 501 U.S. 434 (quoting California v. Hodari D., 499 U.S. 621, 628 (1991)). "What is reasonable depends upon all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." United States v. Montoya de Hernandez, 473 U.S. 531, 537 (1985). In Terry, the Supreme Court pronounced that, "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." Terry, 392 U.S. at 19, n.16.

With these principles in mind, we conclude that a reasonable person in Lewis' shoes would not have felt free to disregard Sorenson after Sorenson impeded Lewis' progress by parking his patrol vehicle in Lewis' path. Several courts have recognized that flashing lights and police pursuit demonstrate police authority to an intended detainee. See Brower v. County of Inyo, 489 U.S. 593, 597 (categorizing "flashing lights and continuing pursuit" as a "show of authority" by police); U.S. v. Taylor, 95 Fed. Appx. 957, 960 (10th Cir. 2004) ("[W]e believe a police car's flashing lights and sirens provide a clear direction to stop."). Here, Sorenson, driving a prominently marked police cruiser, followed Lewis down the street, activated his flashers, and then parked his vehicle in the middle of an intersection so as to block the crosswalk that Lewis was stepping into. Sorenson admitted that the way he parked his vehicle would have forced Lewis to detour outside of the crosswalk in order to continue on his way. Sorenson also testified that he could have parked along the side of the road and obviated the need to activate his flashers, but did not do so because he was in a hurry to speak with Lewis. Sorenson then stepped out of the vehicle in full uniform and approached Lewis and Sumrow.

Each of these factors - the marked vehicle, flashing lights, and the physical positioning of the police cruiser so as to block Lewis' path - demonstrate a "show of authority" by a police officer. Sorenson did not need to activate his lights or block Lewis' path, as there is nothing to indicate that Lewis attempted to flee or evade contact with police; rather, Sorenson could simply have pulled up beside them and engaged Lewis in a consensual manner. By relying on the authority and trappings of his position as a law enforcement officer to require Lewis to speak with him, Sorenson effectuated a Fourth Amendment seizure. Consequently, we must consider whether Sorenson had reasonable suspicion to seize Lewis.

### ii. Was the seizure based upon reasonable suspicion?

A warrantless seizure does not violate the constitution when the stop is based upon a reasonable suspicion that "criminal activity may be afoot." Terry, 392 U.S. at 30. Reasonable suspicion must be more than a hunch; rather, it must be based upon specific and articulable facts. Wardlow, 528 U.S. at 123-24. The government asserts that Sorenson had reasonable suspicion to stop Lewis based on the purportedly furtive manner in which Lewis was carrying the rifle when Sorenson first observed him. Specifically, Sorenson asserts that Lewis "attempted to conceal the rifle and block [his] view of it, using his companion as a shield." (Response to Motion to Suppress, p. 10). Sorenson also notes that it was ten o'clock in the evening at the time that he observed Lewis.

As an initial matter, we note that Lewis' behavior is not rendered inherently suspicious simply because a firearm was involved. It is not *per se* illegal to carry a firearm in public in Pennsylvania, let alone to carry a wrapped bundle that appears to be a firearm. 18 Pa.C.S.A. § 6106(a)(1). Thus, the Third Circuit has held that possession of a firearm, in the absence of "articulable facts suggesting that the gun . . . was defaced or unlicensed, that [the suspect] posed a safety risk to the authorities or [other persons], or that [the suspect] was acting in a manner indicating that he was involved in a different crime," does not create reasonable suspicion. Ubiles, 224 F.3d 218.

Here, however, Sorenson articulated specific facts to support his belief that Lewis might have been "acting in a manner indicating that he was involved in a different crime" or that Lewis' possession of a rifle might have posed a safety risk to others. Id. Sorenson, relying upon his familiarity with firearms gleaned from years of experience as a police officer, testified to seeing what he distinctly believed to be a rifle wrapped oddly in both a blanket and a plastic bag. He further testified that Lewis was walking in a stiff, unorthodox manner so as to keep the rifle tight to his side without moving his arm, and that Lewis appeared to be trying to use Sumrow as a shield, walking in lock-stop behind him so as to obscure Sorenson's view. The United States Supreme Court has acknowledged that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." Wardlow, 528 U.S. at 124 (citing, e.g., United States v. Brignoni-Ponce, 422 U.S. 873, 885 (1975)); see also; United States v. Woodrum, 202 F.3d 1, 7 (1st Cir. 2000) (holding that "slouching, crouching, or any other arguably evasive movement, when combined with other factors particular to the defendant . . ., can add up to reasonable suspicion.") (cited with approval by United States v. Valentine, 232 F.3d 350, 357 (3rd Cir. 2000)). During his testimony, Sorenson, at the Court's request, demonstrated the manner in which Lewis passed in front of his patrol vehicle, thereby allowing the Court to visualize the peculiarity of the behavior. Finally, not only did this incident occur late at night, but Sorenson also opined that it was unusual to see someone carrying a firearm within city limits.

Taking into account the totality of the circumstances, we find this case to be more similar to Valentine than to Ubiles. In Valentine, the Third Circuit held that police had reasonable suspicion to stop an armed suspect based on an anonymous tip in a high crime area. Valentine, 232 F.3d at 356. In reaching its conclusion, the Third Circuit specifically distinguished the facts before it from those presented in Ubiles:

> Our case is distinguishable from Ubiles. First, there is the broader context. Valentine was walking around at 1:00 a.m. in a high-crime area known for shootings. While an individual's presence in a high-crime area is not by itself sufficient to warrant a Terry stop, Wardlow, 528 U.S. at 124, 120 S.Ct. at 676 (citing Brown v. Texas, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979)), "the fact that the

8

> stop occurred in a 'high crime area' [is] among the relevant contextual considerations in a Terry analysis." Id. (citing Adams v. Williams, 407 U.S. at 144 and 147-48, 92 S.Ct. at 1922 and 1924). The constellation of likely criminal acts in a high-crime area at 1:00 a.m. goes well beyond simply carrying a gun without registration or with altered serial numbers.
>
> \* \* \* \* \* \* \* \*
>
> In evaluating the totality of the circumstances, we must also take into account that Valentine and the two men with him immediately began walking away from the patrol car when it arrived. Walking away from the police hardly amounts to the headlong flight considered in Wardlow and of course would not give rise to reasonable suspicion by itself, even in a high-crime area, but it is a factor that can be considered in the totality of the circumstances.
>
> \* \* \* \* \* \* \* \*
>
> In summary, we conclude that the officers had reasonable suspicion after they received the face-to-face tip, were in a high-crime area at 1:00 a.m., and saw Valentine and his two companions walk away as soon as they noticed the police car.

Valentine, 232 F.3d at 356-57.

As in Valentine, corroborative factors support Sorenson's suspicions that Lewis possessed and was attempting to conceal a firearm that might have been used, or was intended for use, in a crime. It was late at night, Lewis was holding what appeared to be a concealed rifle in an evasive, secretive fashion, and Lewis appeared to be walking in an unorthodox fashion so as to use his companion to shield the rifle from Sorenson's view. Consequently, we hold that Sorenson had reasonable and articulable suspicions to justify an investigatory stop. See Ubiles, 224 F.3d at 218; Valentine, 232 F.3d at 357.

### iii. Fruit of the poisonous tree

As Lewis was not seized in violation of the Fourth Amendment, his statements to law enforcement officers following the legal seizure cannot be suppressed as "fruit of the poisonous tree." Wong Sun v. United States, 371 U.S. 471 (1963).

### III. CONCLUSION

9

For all of the foregoing reasons, Lewis' motion to suppress evidence is denied. An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Criminal Action No. 05-24 ERIE |
| | ) |
| BARRY WAYNE LEWIS | ) |

## ORDER

AND NOW, to wit, this 22nd day of December, 2005, for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Defendant Barry Wayne Lewis' Motion [Doc. No. 14] to Suppress is hereby DENIED.

/s/ - Sean J. McLaughlin
United States District Judge

cm: All parties of record. ____