IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA          )
                                  )
          v.                      )          CRIMINAL NO. 05-24 ERIE
                                  )
BARRY WAYNE LEWIS                 )

<u>SENTENCING</u>

Proceedings held before the HONORABLE

SEAN J. McLAUGHLIN, U.S. District Judge,

in Courtroom C, U.S. Courthouse, Erie,

Pennsylvania, on Friday, September 14, 2007.

<u>APPEARANCES</u>:

CHRISTINE A. SANNER, Assistant United States
Attorney, appearing on behalf of the Government.

THOMAS W. PATTON, Assistant Federal Public
Defender, appearing on behalf of the Defendant.

Ronald J. Bench, RMR - Official Court Reporter

2

P R O C E E D I N G S

    (Whereupon, the proceedings began at 9:26 a.m., on Friday, September 14, 2007, in Courtroom C.)

    THE COURT:  All right, before we continue today, the record should reflect that I did receive supplemental submissions from the parties here.  Before I rule on this issue, is there anything else briefly that anybody feels they need to say to me or do you feel it's been sufficiently set forth in your papers; Mr. Patton?

    MR. PATTON:  I'd just be repeating what's in my papers, your Honor.

    THE COURT:  All right.

    MS. SANNER:  The same, your Honor.

    THE COURT:  All right, this is an order.

ORDER

    The issue before the court is whether defendant's 1991 conviction for burglary in Ohio involved a "violent felony" within the meaning of the Armed Career Criminal Act. ("ACCA"), 18 U.S.C. Section 924(e).  When we last met, I gave the parties an opportunity to submit briefs discussing the impact of the Supreme Court's decision in James v. United States, 127 S.Ct. 1586 (2007), on this issue.  I've read the parties' submissions and I've taken their arguments into

1  consideration.  In addition, I have carefully reviewed the

2  James decision as well as other applicable precedent.

3          Ultimately, the question I must answer is whether

4  the offense for which Mr. Lewis was convicted involves conduct

5  "that presents a serious potential risk of physical injury to

6  another."  18 U.S.C.A. Section 924(e)(2)(B)(ii).  As a starting

7  point, I agree with the defendant's position that James

8  requires me to make this determination by looking at the

9  language of the statute, as it has been interpreted by the Ohio

10  courts.  See James, 127 S.Ct. at 1594 (in determining whether

11  Florida's attempted burglary statute met criteria of "violent

12  felony" under the ACCA, the court would look to the manner in

13  which the state statute had been interpreted by the Florida

14  Supreme Court and applied by the lower courts).  I therefore

15  agree with defendant that the case of State v. Wilson, 388

16  N.E.2d 745 (Ohio 1979), among others, is relevant to my

17  analysis.

18          By way of review, the relevant statute is Section

19  2911.12 of the Ohio Revised Code, defining the crime of

20  burglary.  As it existed in 1991, the statute read in pertinent

21  part as follows:

22              (A) No person, by force, stealth, or deception,

23              shall do any of the following:

24              (1) Trespass in an occupied structure or in a

25              separately secured or separately occupied portion

4

1          thereof, with purpose to commit therein any theft

2          offense or any felony.

3   Ohio R.C. Section 2911.12(A)(1) (West 1993).  Thus, a

4   conviction for burglary under this provision required the

5   government to prove:  (i) trespass by force, stealth, or

6   deception; (ii) into an "occupied structure" or a separately

7   secured or occupied portion thereof; (iii) with purpose to

8   commit therein a theft offense or felony.  See Wilson, 388

9   N.E.2d at 749.

10          The term "occupied structure" is statutorily defined

11          as:

12          any house, building, outbuilding, watercraft,

13          aircraft, railroad car, truck, trailer, tent, or

14          other structure, vehicle, or shelter, or any portion

15          thereof, to which any of the following applies:

16          (1) It is maintained as a permanent or temporary

17          dwelling, even though it is temporarily unoccupied

18          and whether or not any person is actually present.

19          (2) At the time, it is occupied as the permanent

20          or temporary habitation of any person, whether or

21          not any person is actually present.

22          (3) At the time, it is specially adapted for the

23          overnight accommodation of any person, whether or

24          not any person is actually present.

25          (4) At the time, any person is present or likely to

1    be present in it.

2  Ohio R.C. Section 2909.01(C)(1)-(4) (West 1993).

3         In _Wilson_, supra, the Ohio Supreme Court clarified

4  that these definitions of "occupied structure" are to be read

5  disjunctively.  As a result, proof of any one of the scenarios

6  contained in 2909.01(C)(1)-(4) will establish the necessary

7  element that the structure in question was an "occupied

8  structure."  Thus, to establish burglary under Section

9  2911.12(A)(1), the government need only prove that the place in

10 question was maintained as a dwelling, OR occupied as a

11 habitation, OR adapted for overnight accommodation, OR that

12 another person was present or likely to be present at the time

13 of the burglary.

14         When we were last together, I expressed my view that

15 the manner in which "occupied structure" is defined brings

16 Section 2911.12(A)(1) within the ambit of the ACCA's residual

17 definition of a "violent felony" because, under one scenario,

18 there will be actual or likely presence of other persons in the

19 burglarized structure.  See R.C. Section 2909.01(C)(4) (West

20 1993).  Under the other three scenarios, "occupied structure"

21 is defined in terms of the very locations (i.e., dwellings,

22 habitations, or places adapted for overnight accommodation)

23 where there is at least a potentiality - if not a likelihood -

24 that others could be present.  See R.C. Section

25 2909.01(C)(1)(3).

6

1          Defendant takes issue with this view.  The essence

2     of his argument is summarized in his supplemental brief as

3     follows:  i.e., that "the ordinary burglary case [in Ohio]

4     involves the unlawful entry into an occupied structure when no

5     one is present or likely to be present"; thus, because no one

6     is actually or likely to be present, "there is no risk of

7     face-to-face confrontation and therefore no serious potential

8     risk of injury to another."  (Defendant's Supplemental Position

9     with Respect to Sentencing Factors [51] at p.5.)  Although I

10    believe that this argument actually overstates the legal effect

11    of Wilson, I nevertheless conclude, upon further consideration

12    of the matter, including an extensive review of relevant Ohio

13    case law, that defendant's argument has merit in the limited

14    context of the crime for which he was charged and convicted.

15          I begin by revisiting the relatively narrow scope of

16    analysis which the Supreme Court undertook in James in

17    determining whether the crime at issue constituted a "violent

18    felony" for purposes of the ACCA.  In James, the defendant had

19    been convicted of attempted burglary under a Florida statute

20    which defined burglary as "entering or remaining in a structure

21    or a conveyance with the intent to commit an offense therein,

22    unless the premises are at the time open to the public or the

23    defendant is licensed or invited to enter or remain."  See 127

24    S.Ct. at 1591 (quoting Fla. Stat. Section 810.02(1) (1993)).

25    Though Florida's attempt statute broadly required only that a

7

defendant take "any act toward the commission" of burglary,
127 S.Ct. at 1594 (quoting Fla. Stat. Section 777.04(1), the
Florida Supreme Court had considerably narrowed the application
of that statute in the context of attempted burglary, such that
the state was required to prove an "overt act directed toward
entering or remaining in a structure or conveyance." Id.
(quoting Jones v. State, 608 So.2d 797, 799 (1992)). Moreover,
while the Florida statute used the terms "structure[s]" and
"conveyance[s]," the Supreme Court noted that James had been
specifically charged with and convicted of attempted burglary
of a dwelling. See 127 S.Ct. at 1599 n. 7. Accordingly, it
limited its analysis under the ACCA to what it termed the
"pivotal question" - i.e., "whether overt conduct directed
toward unlawfully entering or remaining in a dwelling, with the
intent to commit a felony therein, is 'conduct that presents a
serious potential risk of physical injury to another'." The
court did not concern itself with that portion of the statute
that criminalized burglary of "conveyances." Id. at 1599 n. 7.

In this case, Mr. Lewis was specifically charged
with and convicted of burglarizing an occupied structure which
was the "habitation" of another person (Adelbert Cross). Thus,
while the term "occupied structure" is defined in various ways
by the Ohio statute, the definition at issue here concerns
structures or portions thereof which are "occupied as the
permanent or temporary habitation of any person, whether or not

8

1  any person is actually present."  See R.C. Section

2  2909.01(C)(2).

3           In Wilson, supra, the Ohio Supreme Court held that

4  the aggravated burglary statute which combines two separate

5  definitions of "occupied structure" as an aggravating element

6  (i.e., habitation in which at the time a person is present or

7  likely to be present), does not offend equal protection or due

8  process principles.  See Wilson, 388 N.E.2d at 747, syllabus at

9  paragraph 2.  In arriving at this ruling, the Wilson court held

10  that the aggravated burglary statute and the simple burglary

11  statute do not proscribe different penalties for identical

12  offenses.  The court pointed out that simple burglary requires

13  the state to prove only one definition of "occupied structure,"

14  while the aggravated burglary statute combines the two separate

15  definitions of habitation and actual or likely presence and

16  requires the state to prove both beyond a reasonable doubt.

17  See Id. at 749-750.  Moreover, the Wilson court observed that

18  the various definitions of "occupied structure" are not

19  coterminous and proof of one definition does not thereby,

20  alone, prove another - i.e., proof that the occupied structure

21  was a "habitation" does not thereby, alone, prove that another

22  person was likely to be present at the time of the offense, and

23  vice-versa.  Id. at 750.  In ruling that the aggravated

24  burglary statute satisfied due process principles, the court

25  ruled that proof of habitation does not give rise to any

1  presumption that another person was present or likely to be

2  present at the time of the burglary.  Id. at 750-51.  Thus, to

3  prove that another person was likely to be present in a

4  habitation at the time of the burglary, the state must produce

5  additional evidence beyond the mere fact that the target was

6  occupied as a temporary or permanent habitation.  See Id. at

7  751; State v. Kilby, 361 N.E.2d 1336, 1337, syllabus at

8  paragraph 1 (Ohio 1977) ("Where the state proves that an

9  occupied structure is a permanent dwelling house which is

10  regularly inhabited, that the occupying family was in and out

11  on the day in question, and that such house was burglarized

12  when the family was temporarily absent, the state has presented

13  sufficient evidence to support a charge of aggravated burglary

14  under R.C. 2911.11.").

15       Based on these principles, Mr. Lewis contends that

16  the offense of simple burglary of a habitation necessarily

17  involves facts where no person was present or likely to be

18  present at the time of the offense.  Defendant submits that, if

19  the case involves the likely presence of another person at the

20  scene of the burglary, one should presume that the state will

21  charge aggravated burglary in the ordinary case, since the

22  elements of that crime will be satisfied.  By the same token,

23  he submits, we should assume that the ordinary case of simple

24  burglary, where the occupied structure is a habitation, will

25  involve facts where the state cannot prove the actual or likely

1   presence of another person.

2            Originally, I was not persuaded by Mr. Lewis's

3   argument because of my perception that there was a material

4   difference between the legal standards at issue in Wilson -

5   i.e., proving beyond a reasonable doubt that someone was

6   present or likely to be present in the burglarized habitation -

7   and the legal standard for determining whether the crime at

8   issue meets the definition of a "violent felony" within the

9   meaning of the ACCA - i.e., a finding that simple burglary of a

10  habitation presents a "serious potential risk of physical

11  injury to another."  When we last met, it was my view that,

12  while proof of habitation does not alone prove beyond a

13  reasonable doubt that another person was likely to be present

14  in the burglarized structure, nevertheless a "habitation" is

15  the sort of place where others might potentially be present

16  and, therefore, the simple burglary of another person's

17  habitation or home represents a serious potential risk of harm

18  even in cases where the state cannot prove that it was likely

19  the occupant would be there at the time of the offense.  Stated

20  more simply, my previous view of the issue was premised on an

21  understanding that there is a real and substantial difference

22  between establishing the likelihood of another's presence at

23  the time of the offense versus establishing that another person

24  could potentially have been present and suffered physical

25  injury at the time.

1    However, upon further consideration of the matter, I
2 find that the defendant's argument has merit.  My conclusion on
3 this issue is largely informed by the manner in which Ohio
4 courts have construed and applied the <u>Wilson</u> ruling and the
5 manner in which they define and apply the concept of "likely
6 presence."  As one Ohio court has explained:

7            Although the term "likely" connotes something more
8            than a mere possibility, it also connotes something
9            less than a probability or reasonable certainty.
10           See <u>State v. Holt</u> (1969), 17 Ohio St.2d 81, at 85,
11           246 N.E.2d 365 [460.O2d 408].  A person is likely to
12           be present when a consideration of all the
13           circumstances would seem to justify a logical
14           expectation that a person could be present.
15 <u>State v. Green</u>, 480 N.E.2d 1128, 1132 (Ohio App. 1984)
16 (alteration in the original) (emphasis added).  <u>See</u> <u>also</u>
17 <u>State v. Tippie</u>, No. 91 CA 1511, 1993 WL 148775 at 8 (Ohio App.
18 May 3, 1993); <u>State v. Brisbin</u>, No. 54921, 1989 WL 12918 at 5
19 (Ohio App. Feb. 16, 1989).

20           As the foregoing language suggests, Ohio gives a
21 somewhat broad construction to the concept of "likely presence"
22 as it relates to the issue of whether the occupant of a
23 burglarized habitation was "likely to be present" at the time
24 of the offense.  "Likelihood" in this context does not appear
25 to mean "probability" but, rather, something more akin to a

12

reasonable possibility or (to borrow a phrase) a "serious
potential."  As one court put it,

> ... for a conviction for aggravated burglary to
> lie, the state must present sufficient facts from
> which the jury can draw a permissible inference that
> at the time of the trespass there is a person
> present or a likelihood that a person would be
> present at the burglarized dwelling.  The state
> satisfies this requirement when it presents evidence
> showing either that a person is present or that it
> is uncertain when the occupier(s) of the dwelling
> would be present.  However, when the record
> conclusively shows that at the time of the trespass,
> the work habit of the occupier(s) keeps them away
> from the dwelling, thereby making it less likely
> that a person would be present at the dwelling, the
> state's burden is not met and a conviction for
> aggravated burglary cannot lie.  Merely showing that
> a person or persons dwell in the structure is
> insufficient as a matter of law.

State v. Johnson, No. 59096, 1991 WL 204976 at 5 (Ohio App.
Oct. 10, 1991).

This appears to be an accurate summary of the manner
in which Ohio courts have treated the concept of "likely
presence."  Many decisions have upheld convictions for

13

aggravated burglary where it was uncertain under the facts of the case when the occupier(s) of the dwelling would be present or where contingencies made it possible that the occupant(s) could have returned home during the time of the burglary. See, e.g., State v. Fowler, 445 N.E.2d 1119, 1121 (Ohio 1983) (upholding aggravated burglary conviction where evidence showed that the family was home on the day of the crime, that occupants occasionally worked at different locations, and that they were not always home at the same time); State v. King, No. 68978, 1996 WL 284875 at 3 (Ohio App. May 30, 1996) (jury could find that occupant of burglarized apartment was "likely to be present" despite the fact that occupant's regular work hours and her children's regular attendance at school typically kept them away during the time of the burglary; evidence showed that occupant could have been home if she or her children had been sick); State v. Tippie, No. 91 CA 1511, 1993 WL 148775 at 8-9 (Ohio App. May 3, 1993) (likely presence was established by evidence that burglarized mobile home was utilized by victim as a second home, that he came to the home on alternate weekends and occasional week nights, that his family occasionally stayed in the home, and that he allowed friends to use the place); State v. Sisco, No. 90-J-9, 1991 WL 124426 at 3 (Ohio App. July 2, 1991) (where sole occupant of burglarized mobile home was visiting friends and relatives in Cleveland at the time of the burglary and occasionally stayed with other family members,

14

1   evidence was nevertheless sufficient for jury to find "likely

2   presence" where her son testified that he checked on the mobile

3   home daily and that he did not necessarily always know when his

4   mother would be there); State v. Brisbin, supra, at 4-5 (where

5   occupant had vacated her house several days prior to burglary,

6   jury could nevertheless infer that she was likely to be present

7   at the time of the offense since occupant returned periodically

8   to pick up her mail and had left behind numerous items which

9   she intended to retrieve; the court noted that it is "often the

10  case" that "a resident can return and surprise an unwary

11  criminal who may have earlier thoroughly investigated the

12  occupancy of the house"); State v. Gulley, No. C-850179, 1986

13  WL 958 at 3 (Ohio App. Jan. 22, 1986) (where occupant of

14  burglarized apartment was away at regular work hours and her

15  child was at babysitter's during time of burglary, jury could

16  nevertheless find "likely presence"; no evidence was offered as

17  to the whereabouts of the third occupant and, additionally,

18  "jury could reasonably conclude that a parent who normally

19  worked away from home might be likely to be there occasionally

20  to care for her young child even during working hours because

21  of the many ailments and mishaps that commonly afflict young

22  children and their babysitters"); State v. Robinson, No.

23  C-820294, 1983 WL 5460 at 2 (state produced sufficient proof of

24  likely presence where, although residents were out of the house

25  at work and school at regular hours during which burglary

1   occurred, a relative might on occasion enter the house to
2   retrieve tools loaned to an occupant and family member could
3   have been present by virtue of illness or other cause);
4   State v. Williams, No. C-800141, 1981 WL 9663 at 2-3 (Ohio App.
5   March 4, 1981) (although defendant burglarized home while
6   residents were away on vacation, jury could find "likely
7   presence" where neighbors had been given keys and would
8   periodically enter the house to check on it).

9           In sum, "likely presence" is so broadly construed so
10  as to be virtually coterminous with the concept of "potential
11  presence."  As a result, the aggravated burglary statute
12  encompasses a wide array of factual scenarios where there
13  exists a serious potential for face-to-face confrontation.

14          At the same time, my review of the case law supports
15  Mr. Lewis's assertion that, in the "ordinary" case under Ohio
16  law, the simple burglary of a habitation involves situations
17  where there is very little, if any, potential for another
18  person to be present at the time of the offense.  In numerous
19  cases, Ohio courts have vacated convictions for aggravated
20  burglary and/or reduced them to simple burglary where the
21  evidence did not support a finding of "likely presence."
22  See, e.g., Hargrove v. Haviland, No: 1:02CV00703, 2005 WL
23  1379098 (S.D.Ohio June 8, 2005) (granting defendant's Section
24  2254 petition relative to conviction for aggravated burglary
25  where state failed to prove required element of likely

16

presence; no evidence existed in the record as to the victim's whereabouts on the day in question, such as victim's work hours and court could not presume victim's likely presence based on the mere fact that the target was victim's habitation); State v. Colon, No. 61253, 1992 WL 389074 (Ohio App. Dec. 17, 1992) (conviction for aggravated burglary modified to simple burglary where evidence showed that burglary took place around noon when there was no likelihood that occupants would be in the burglarized habitation; evidence showed that owner and his wife both left the home with their daughter every morning and the owner admitted that no one was normally home during the day); State v. Johnson, No. 59096, 1991 WL 204976 (Ohio App. Oct. 10, 1991) (holding that defendant should have been convicted of simple burglary as lesser included offense of aggravated burglary where evidence showed that occupants of the home were regularly away at work or at babysitter's at the time of day during which the burglary occurred); state failed to show that there was a "minimal likelihood" that a person would be present at the time of the offense); State v. Grines, No. 1070, 1982 WL 3134 (Ohio App. May 19, 1982) (conviction for aggravated burglary modified to simple burglary where, at the time of the offense, sole occupant of burglarized mobile home was in Alabama, where she remained for several months, and no other person had keys to the home or permission to enter); State v. Durham, 360 N.E.2d 743 (Ohio App. 1976) (conviction

1    for aggravated burglary modified to simple burglary where
2    victim individually occupied the burglarized apartment and his
3    usual and ordinary work habits regularly took him away during
4    certain hours of the day such that there was a "minimal
5    likelihood" that a person would be present at the time of the
6    offense).

7    　　　　Since my ultimate inquiry concerns whether the crime
8    at issue fits within the ACCA's residual definition of "violent
9    felony," it is appropriate to review the Supreme Court's
10   pronouncement of the relevant standard of review.  Under the
11   ACCA, I am to consider whether burglary of a habitation as
12   defined by relevant Ohio law involves conduct "that presents a
13   serious potential risk of physical injury to another."
14   18 U.S.C.A. Section 924(e)(2)(B)(ii).  As the Supreme Court
15   observed in James, Section 924(e)(2)(B)(ii)'s residual
16   provision speaks in terms of a "potential risk," which "are
17   inherently probabilistic concepts."  127 S.Ct. at 1597.  In
18   employing the phrase "potential risk," "Congress intended to
19   encompass possibilities even more contingent or remote than a
20   simple 'risk'."  Id.  Thus, the ACCA's definition of "violent
21   felony" does not require that "every conceivable factual
22   offense covered by a statute must necessarily present a serious
23   potential risk of injury." Id.  Instead, the proper inquiry is
24   whether the conduct encompassed by the elements of the offense,
25   in the ordinary case, presents a serious potential risk of

1   injury to another."  Id.  "As long as an offense is of a type

2   that, by its nature, presents a serious potential risk of

3   injury to another, it satisfies the requirements of Section

4   924(e)(2)(B)(ii)'s residual provision."  Id.

5            I find, based on all of the above considerations,

6   that the crime for which Mr. Lewis was convicted in 1991 did

7   not involve conduct which presents a serious potential of

8   physical injury to others.  Although the government here

9   concedes that the occupant of the burglarized habitation

10  (Adelbert Cross) was hospitalized at the time of the offense

11  and, therefore, was not likely to be present when the crime was

12  committed, I do not make my ruling based on any consideration

13  of the particular facts concerning Mr. Lewis's offense.

14  Rather, I base my ruling on a categorical view of the offense

15  with which Mr. Lewis was charged and convicted - as that crime

16  was defined in 1991.

17            In arriving at my ruling, I recognize the decision

18  by the Sixth Circuit Court of Appeals in United States v. Lane,

19  909 F.2d 895, 903 (6th Cir. 1990), wherein the court held that

20  the defendant's prior conviction for attempted burglary under

21  the same Ohio statute at issue here was a "violent felony"

22  within the meaning of the ACCA.  The court reached that

23  conclusion based on the following reasoning:

24            [B]urglary in Ohio requires "trespass in an occupied

25  structure... with purpose to commit therein any theft

1   offense..."  Ohio Revised Code Ann. Section 2911.12.  An

2   "occupied structure" is defined broadly to include places in

3   which a person is actually or likely to be present.  See Ohio

4   Revised Code Ann. Section 2909.01.  A Committee Comment

5   following Section 2909.01 states, "The definition's general

6   concept is that the actual or likely presence of a person in a

7   structure, regardless of the nature of the structure itself,

8   creates a more serious risk of harm from commission of arson,

9   burglary, and related offenses, and thus warrants more severe

10  treatment of offenders."  Thus, burglary in Ohio "presents a

11  serious potential risk of physical injury to another" because

12  the burglary statute requires the actual or likely presence of

13  a person in the burglarized structure.

14  909 F.2d at 903.

15          Mr. Lewis contends, and I agree, that this last

16  sentence - i.e., the Lane court's assumption that the crime of

17  simple burglary requires the actual or likely presence of a

18  person in a burglarized structure -- cannot be reconciled with

19  the Ohio Supreme Court's ruling in Wilson.  Under Wilson, the

20  crime of burglarizing a habitation does not require the likely

21  presence of another person and, indeed, cannot be construed as

22  requiring the likely presence of another; were it otherwise,

23  then the aggravated burglary statute would violate the Equal

24  Protection clause.  Further, notwithstanding the Committee

25  Comment following Section 2909.01, Wilson prohibits courts from

20

1    construing the term "occupied structure" as the Lane court

2    did - i.e., as being coterminous with or legally equivalent to

3    "places in which a person is actually or likely to be present."

4    Lane, 909 F.2d at 903.  Wilson makes clear that the definitions

5    of "occupied structure" are to be construed disjunctively and

6    that proof of one definition does not, alone, equate to proof

7    of another; proof that a burglarized structure is an occupied

8    habitation does not, by itself, establish that others were

9    likely to be present at the time of the offense.  See, e.g.,

10   Glenn v. Dallman, 686 F.2d 418, 422 (6th Cir. 1982) (proof that

11   a burglary occurred in an occupied structure is not sufficient

12   to prove that someone was present or likely to be present "at

13   the time") (citing Wilson).

14        In sum, I agree with Mr. Lewis that the fundamental

15   assumption upon which the Lane court based its reasoning is

16   wrong as a matter of law and cannot be reconciled with Wilson.

17   Thus, with due respect to the Sixth Circuit, I decline to

18   follow its ruling in this case.

19        For all of the foregoing reasons, the burglary

20   charge in this case did not involve conduct that presented a

21   serious potential for physical injury to other persons within

22   the meaning of the ACCA.  While we note that there is some

23   tension between this conclusion and the apparent intent of the

24   Ohio legislature in defining "occupied structure" as discussed

25   in Lane, the Ohio Supreme Court's interpretation of the statute

1  as set forth by <u>Wilson</u> is controlling.  Finally, we note in

2  passing, that the burglary statute has been amended such that

3  actual or likely presence is now a stated element of the

4  offense of simple burglary.

5        The defendant's objection to the probation officer's

6  conclusion that the 1991 burglary conviction represents a

7  "violent felony" within the meaning of the Armed Career

8  Criminal Act is sustained.  We'll take a short recess, come out

9  and continue.

10        (Recess from 10:06 a.m.; until 10:14 a.m.)

11        THE COURT:  Before taking up the government's

12  motion, I make the following findings.  The total offense level

13  here is 17.  With a criminal history category of IV.  Statutory

14  provision as to custody not more than 10 years imprisonment.

15  Guidelines 37 to 46 months.  Statutory provision as to

16  probation ineligible.  Also ineligible under the guidelines.

17  Statutory provision as to supervised release not more than five

18  years.  Guidelines at least two years, but not more than three

19  years.  Statutory provision as to a fine $250,000.  The

20  guideline provisions $5,000 to $50,000.  Restitution is

21  inapplicable under both the statute and the guidelines.  And a

22  special assessment of $100 applies with respect to both.  All

23  right, Ms. Sanner.

24        MS. SANNER:  Just for the record, your Honor, I want

25  to preserve the government's objection to your ruling.

22

1          THE COURT:  You have.

2          MS. SANNER:  The government believes the court is

3     conflating the issue of occupied structure under <u>Taylor</u> with

4     likely presence under the Ohio burglary statute.

5              With regards to the motion for upward departure, the

6     government notes that it was March 28, 2005, at 10 o'clock at

7     night and on a city street in downtown Warren, when the deputy

8     sheriff saw Barry Lewis carrying and trying to conceal a

9     firearm.  The rifle was partially concealed, it was wrapped in

10    a blanket and it was protruding from a garbage bag.  He tried

11    to shield the rifle from the officer's view.  He did not flag

12    down the officer.  He did not say hey, I just found this and

13    I'd like to turn it over.  Instead, when approached, he asked

14    repeatedly if he could keep the firearm.  At the scene the

15    defendant told the officer that he had found it laying against

16    a tree.  He later told another officer that it was laying in

17    the grass in someone's yard.  And finally he told someone else

18    that he was just picking through other people's garbage when he

19    found it.  He asked again if he just couldn't keep the firearm

20    if no one came to claim it.

21              A criminal check at the scene revealed an

22    outstanding extraditable warrant for the defendant's arrest in

23    California.  The defendant had absconded from parole and he was

24    a wanted fugitive at the time he had the rifle.

25              The defendant wasn't going to give the rifle to the

1   officer unless he had to.  The officer had driven by him twice
2   before he had approached the defendant in the first instance.
3   And he tried to shield it repeatedly from the officer's view.
4   He asked repeatedly if he could just keep it.

5          The defendant may not deflect blame by portraying
6   himself as a victim of circumstances here.  If he does, it is
7   inconsistent with acceptance of responsibility.  A defendant
8   who falsely denies or frivolously contests relevant conduct
9   found by the court to be true, is acting in a manner
10  inconsistent with acceptance of responsibility.

11         The day the defendant was scheduled to plead guilty,
12  he said that he was hearing voices.  It was later determined by
13  two psychiatrists that he was malingering, faking it.

14         From the age of 19, the defendant has consistently
15  engaged in repeated acts of criminally violent conduct.  He has
16  an extremely lengthy criminal history, from the age of 19 and
17  in the year 1978.  He has prior seven adult convictions, this
18  makes number eight, and ten additional arrests for other
19  conduct.  These offenses are very serious crimes.  Carrying
20  concealed weapons, aggravated assault, burglary, aggravated
21  menacing, abduction, burglary, battery, obstructing, resisting
22  officers, child abuse, conviction for assault with a deadly
23  weapon, was the most recent of these convictions.

24         Many of the defendant's prior convictions and
25  arrests dealt with violent behavior and firearms.  In 1995 he

1  was sentenced to nine years imprisonment for assault with a

2  deadly weapon.  Upon his release, it took him less than four

3  months to have his parole revoked for absconding from

4  supervision.

5          Over the following two years, after his release, the

6  defendant absconded from parole three more times, resulting in

7  additional parole revocations.  Indeed, he absconded and was

8  wanted at the time he committed the instant offense.  He has

9  repeatedly demonstrated his penchant for recidivism and for

10  violence.

11          In a 30-year criminal history, this defendant, in

12  the government's view, is precisely what Congress had in mind

13  in defining career criminal.  And the government respectfully

14  requests that this court consider all of this in imposing

15  sentence.  The defendant's criminal history in this case can

16  only reflect the last several of the defendant's many numerous

17  convictions in reaching the range that it did.

18          THE COURT:  All right, thank you, Ms. Sanner.  All

19  right, Mr. Patton.

20          MR. PATTON:  Judge, as a housekeeping matter, I

21  believe you said, when you were making your findings, that the

22  applicable guideline, that the maximum amount of supervised

23  release was five years under the statute.  I believe based on

24  your ruling on our objection, finding that the ACCA did not

25  apply, takes the statutory maximum down to --

1       THE COURT:  What did I say?

2       MR. PATTON:  You said the statutory maximum for
3   supervised release was for five years.  It believe that should
4   have gone down to a statutory maximum of three years based
5   on --

6       THE COURT:  You're talking about under the
7   guidelines?

8       MR. PATTON:  No, under the statute the most
9   supervised release he can get is three years.

10      THE COURT:  Not more than three years under the
11  statute?

12      MR. PATTON:  Correct.  The guidelines range would be
13  two to three years, I believe that's correct.

14      THE COURT:  All right.  With that the record is so
15  corrected.

16      MR. PATTON:  Your Honor, with regard to the
17  government's motion for upward departure, I would respectfully
18  submit there isn't anything to justify an upward departure
19  under Section 4A1.3 of the guidelines.  With regard to the
20  facts of the case, nothing regarding the particular facts of
21  this case warrant an upward departure under 4A1.3.  The
22  government, I'm not sure what part of Mr. Lewis's statements
23  they're claiming are false.  To this day there hasn't been any
24  evidence that anybody reported that gun stolen.  At the time of
25  the suppression hearing, we asked the officers, nobody had

1    reported the gun stolen.  It was a pretty nice rifle, I submit

2    that if somebody actually had that stolen from them, they would

3    have reported it.

4            Mr. Lewis pled guilty, he admitted he illegally

5    possessed the weapon, I'm not sure what more the government

6    wants from him.  He has admitted that he committed a crime.  I

7    don't believe he's acted inconsistent with acceptance of

8    responsibility.

9            While the mental health experts at the medical

10   center in Springfield found that there was malingering, he was

11   found not to be competent by Dr. Ryan.  This court found him

12   not to be competent.  I'm not disputing the competency, I

13   believe he is competent.  But I don't think anybody can

14   objectively review his mental health history and not conclude

15   that he does not have the same level of mental functioning as

16   the ordinary citizen.

17           I see the government has under motion for upward

18   departure under 4A1.3 laid out three grounds.  First was the

19   fact that some of Mr. Lewis's prior convictions are too old to

20   receive any criminal history points.  But that is just a

21   function of the Sentencing Guidelines, a judgment made under

22   the guidelines that based -- that you can only go back so far

23   in time to get criminal history points for convictions.  I

24   don't believe the government has shown there is anything so

25   unusual about this case.  Again, we're talking about a

1  traditional departure from the guidelines, we're talking about

2  finding something so extraordinary about the case that would

3  justify a departure from the guideline range, that 4A1.3

4  requires that the criminal history category as calculated by

5  the guidelines, here Roman Numeral IV, substantially

6  under-represents Mr. Lewis's criminal history. The fact that

7  some of the convictions are too old, that fact has already been

8  taken into account. The government hasn't explained how there

9  is something so unique about Mr. Lewis's prior convictions that

10 the policy judgment of the guidelines as to whether the cutoff

11 for assigning criminal history points should be overridden by

12 this court.

13         The government claims that some of Mr. Lewis's prior

14 convictions involve weapons. The first one they point to was a

15 conviction where Mr. Lewis was 19, back in 1978, where he's

16 carrying a concealed weapon. There aren't any details of the

17 offense, it's 30-years-old. I would submit the fact that he

18 got a $25 fine as a sentence would indicate to you that the

19 concealed weapon couldn't have been much of a weapon and

20 certainly couldn't have been used against anybody to get a

21 sentence of $25.

22         The government then points in their papers to Mr.

23 Lewis's aggravated menacing conviction saying that because Mr.

24 Lewis had been charged with the offense of felonious assault

25 with a gun, the offense involved a weapon. But Mr. Lewis was

1  not convicted of felonious assault with a gun.  The government

2  hadn't provided you any specific facts to show that a gun was

3  actually involved.  Section 4A1.3 specifically states that "a

4  prior arrest record itself shall not be considered for purposes

5  of an upward departure under this policy."  And so that

6  conviction that you have no evidence before you that shows that

7  a weapon was involved with that offense.

8          Now, the third conviction is Mr. Lewis's California

9  conviction, for assault with a deadly weapon, which did involve

10  a weapon.  But that conviction has already increased Barry's

11  sentence in two ways.  It, number one, increased his offense

12  level, his base offense level from a 14 to a 20.  Because that

13  is a crime of violence.  And so instead of having a base

14  offense level of 14, which is the base offense level that

15  applies to anyone who is a prohibited person that possesses a

16  firearm, Mr. Lewis actually had a base offense level of 20

17  because he possessed a weapon after having suffered a

18  conviction for a crime of violence.  Plus, Barry is getting

19  criminal history points for the California conviction.  He got

20  three criminal history points for conviction itself.  Plus, he

21  got two criminal history points because he committed this

22  offense while he was on parole for the California offense.  So

23  the fact that he committed this offense while he was on parole

24  in California, again, has already been taken into account by

25  the guidelines.

1          The government's last argument in its papers

2    basically expresses dissatisfaction with the sentences that

3    Barry has received in the past.  I would submit that there

4    isn't any basis for this court to try and second guess the

5    sentences that were imposed previously.

6          THE COURT:  What about his noncompliance with parole

7    over the years?

8          MR. PATTON:  His noncompliance with parole over the

9    years has been taken into account in the very sentences that he

10   violated the parole on.  When he violates, he gets revoked, he

11   does more time.  Indeed, California right now has a detainer

12   lodged against Mr. Lewis for his parole violations.  Before the

13   federal charge was filed that what was used to hold him in

14   Warren County, was the warrant out of California.  And so he

15   was originally picked up by the Warren people, they used the

16   warrant out of California to hold him until the feds got this

17   charge filed against him.  Now, California has a detainer.  And

18   the California court can and presumably will give him

19   additional punishment for committing this offense while on

20   parole.

21         THE COURT:  At the conclusion of this sentence?

22         MR. PATTON:  Correct.  And this sentence, as the

23   guideline range is calculated, takes into account that he was

24   on parole.  Because he receives two criminal history points

25   here for committing the offense while on parole.  If you look

1    at paragraph 38, they gave him a criminal history score of IV,

2    based solely on his prior convictions.  But then they add two

3    more criminal history points in paragraph 39 because he

4    committed this offense while he was on parole for the San Diego

5    sentence.  So that's taken into account.  And, additionally, he

6    gets one additional point put on his criminal history point for

7    committing this offense within two years of release.  So that

8    bumps him what he would have been in criminal history category

9    III, it bumps him up into criminal history category IV.  So

10   he's already facing a longer sentence, a higher offense,

11   criminal history category, excuse me, because the guidelines

12   give him points for committing the offense while on parole

13   within two years of being released.  So I would submit that

14   while certainly if you read it you would be concerned about the

15   fact that he has violated supervision in the past.  But that's

16   built into the guidelines.  He's going to be on supervised

17   release here, if he violates that supervised release, he will

18   be subjected to the possibility, in all likelihood, the

19   probability of further jail time for violating the conditions

20   of his supervised release.  So I think the guidelines have

21   taken that factor into account.

22             THE COURT:  Anything else?

23             MR. PATTON:  Not on the departure motion.

24             THE COURT:  Do you have anything you want to say,

25   Ms. Sanner, in response?

1     MS. SANNER:  Yes, I do.

2     THE COURT:  All right, come on up.

3     MS. SANNER:  I think in looking at this defendant's

4 criminal history, it's most helpful to step back and kind of go

5 through the time line of what he did and when he did it.

6     It was in September of 1978 that he was convicted in

7 Ohio for carrying a concealed weapon.  In October of '78, the

8 very next month, he was arrested in Ohio for felonious assault,

9 aggravated burglary.

10     In June of 1980 he was arrested again in Ohio for

11 felonious assault and coercion.  That same month he was also

12 arrested in Ohio for kidnapping.

13     In July of 1980, he was convicted in Ohio of

14 aggravated menacing and sentenced, the charge was felonious

15 assault with a gun.

16     In October of 1981, he was arrested in Ohio for

17 kidnapping.  Although he was wanted in Ohio, he was found in

18 Texas.  In Texas he resisted arrest, was shot while fleeing,

19 and was later found in his apartment.  The officer who shot him

20 was found to have acted in self-defense.

21     In July of 1982 he was convicted for abduction and

22 received 1 to 10 years.

23     In August of 1985 he was arrested in Ohio for

24 kidnapping.

25     THE COURT:  Can I interrupt you for one second, as

1  you're going through the history and the specifics, do all of

2  those specifics about the, for instance, the officer acting in

3  self-defense, is all this in the presentence report, is it of

4  record?

5          MS. SANNER:  The government I think may have to

6  proffer that particular aspect.  I don't recall if that's in

7  the presentence report.  But the government has affidavits and

8  the police report from that particular conviction, as well as a

9  newspaper article.

10         THE COURT:  All right.

11         MS. SANNER:  In July of 1982, he was convicted of

12 abduction in Ohio, he received 1 to 10 years.

13         In August of 1985, he was arrested in Ohio for

14 kidnapping.

15         In July of 1990 he was arrested in Ohio for

16 aggravated burglary.  None of this is counting against him.

17         In March of 1991, he was convicted in Ohio for

18 burglary, received 3 to 15 years.

19         In January of 1992, in California, he was arrested

20 for child cruelty and cruelty assault.  In 1992 he was

21 convicted of battery.

22         In May of 1992, he was arrested for corporal

23 injuries to spouse.

24         In September of 1992, he was arrested in California

25 for assault and first degree burglary.

1    In June of 1993, he was convicted in California for
2 obstructing and resisting an officer.

3    In October of 1993, he was arrested again for
4 obstructing and resisting an officer.

5    In 1994, he was convicted in California for child
6 abuse.

7    In August of 1995, he was convicted in California
8 for assault with a deadly weapon.  That kept him put away for a
9 while.  He was in California for nine years after that offense.
10 As soon as he was released, it took him exactly about four
11 months before he started violating his parole.  In September of
12 2002, was his first violation.  His second was in March of
13 2003.  His third was in July of 2003.  And his fourth was in
14 January of 2004, when he obstructed an officer again.  Again,
15 there's a period of lapse between January of 2004 --

16    THE COURT:  Excuse me.  Mr. Lewis, you've got to be
17 quiet, I can't listen to you and I can't listen to her at the
18 same time.

19    THE DEFENDANT:  Yes, your Honor.

20    MS. SANNER:  There was a period of lapse when he
21 went missing in action from January of 2004 to March of 2005,
22 when he was arrested with a gun here in Pennsylvania.

23    His criminal history does not adequately reflect the
24 seriousness of his offenses and the violence of his offenses.
25 It simply does not adequately take into account what this

1   defendant has been doing over the past 30 years of his life.

2   Which has been involved with serving half of that time

3   physically in jail, the other half with 18 arrests and

4   convictions.

5          THE COURT:  What do you say to Mr. Patton's point

6   about the convictions that are too old to be counted.  Are they

7   nevertheless, despite that fact, can they nevertheless be

8   considered?

9          MS. SANNER:  Yes.  Section 4A1.3 tells the court

10  that an upward departure is warranted when reliable information

11  indicates that the defendant's criminal history substantially

12  under-represents the seriousness of his criminal history and

13  the likelihood that he will commit other offenses.  In this

14  case the defendant has both a serious criminal history and the

15  government submits he is incredibly likely to recommit other

16  offenses.  This court should take this into consideration when

17  imposing this defendant's sentence.

18         THE COURT:  All right.

19         MR. PATTON:  Your Honor, I just want to highlight,

20  Ms. Sanner went through the arrests, as well as convictions.

21  4A1.3 says you cannot use simply prior arrests in making your

22  determination.  Because they are only arrests and nothing was

23  proven.

24         THE COURT:  So I'm clear and didn't misinterpret

25  your papers, you're not telling me, for purposes of determining

1    whether or not the departure is appropriate, I'm not precluded

2    from considering, am I, convictions that happened to be too old

3    to be counted under the guidelines?

4         MR. PATTON:   Your Honor, 4A1.3(a)(2), which I cite

5    in our papers, lists out five -- it says the information

6    described in subsection (a) may include information concerning

7    the following.  Prior sentences not used in computing criminal

8    history category, for example, sentences for foreign and

9    triable offenses.  Or prior sentences of substantially more

10   than one year imposed as a result of independent crimes

11   committed on different occasions.  Prior similar misconduct

12   established by a civil adjudication or by a failure to comply

13   with an administrative order.  Whether the defendant was

14   pending trial or sentencing on another charge at the time of

15   the instant offense.  Or prior similar criminal conduct not

16   resulting in a criminal conviction.  Nowhere on that list of

17   five things does it tell you that you can rely on prior

18   convictions for which the guidelines do not assign points

19   because they're too old.  So I would submit that you can't rely

20   on those.

21        MS. SANNER:   Your Honor, the government is directing

22   your Honor's attention to both 4A1.3 and 4B1.4 which --

23        THE COURT:  Hang on.

24        MS. SANNER:   4B1.4 specifically talks about

25   implementing ACCA, the Armed Career Criminal Act, and states

1  that 924(e) in some cases the defendant's criminal history may

2  not adequately reflect the defendant's criminal history.  The

3  government is directing your Honor to both of those sections.

4          THE COURT:  What section?

5          MS. SANNER:  4B1.4.

6          THE COURT:  But I've already determined -- wait a

7  minute, which section of 4B1.4?

8          MS. SANNER:  I believe it's in the notes there, your

9  Honor.

10         THE COURT:  I'm sorry, what note again?

11         MS. SANNER:  It's Application Note 1 to 4B1.4.

12         THE COURT:  What principle are you citing it for?

13         MS. SANNER:  It's actually the background.  Although

14  your Honor has determined, made its ruling that he's not an

15  armed career criminal, the background to this commentary notes

16  that in some cases the criminal history does not adequately

17  reflect the defendant's criminal history.  That is the

18  background of 4B1.4.

19         THE COURT:  I don't want to spend too much time on

20  this, but this is a pure question of law, which obviously we

21  want to get right.  There is a disagreement between the two of

22  you as to whether I can consider, for purposes of an upward

23  departure, crimes that are too old to be counted in the

24  criminal history computation, is that what I'm hearing --

25  you're telling me I can't consider his previous conduct because

1  it's too old?

2       MR. PATTON:  I'm saying that you cannot look at the

3  ones that are simply too old and say based on those, under

4  4A1.3(a), his criminal history category significantly

5  under-represents --

6       THE COURT:  But I'm clearly entitled to throw them

7  all into the mix in determining likelihood for further crimes

8  and the other aspect of it, otherwise, it wouldn't make any

9  sense?

10      MR. PATTON:  The likelihood of further crime, I

11 would agree with that analysis.

12      THE COURT:  All right, I'm going to take a short

13 recess and look at this issue and then come out and we'll

14 finish this.

15           (Recess from 10:39 a.m.; until 11:18 a.m.).

16      THE COURT:  This is an order.

17                          ORDER

18      Presently pending before the court is a motion for

19 upward departure filed by the government.  Pursuant to United

20 States Sentencing Guideline 4A1.3:

21           "If reliable information indicates that the

22           defendant's criminal history category substantially

23           under-represents the seriousness of the defendant's

24           criminal history or the likelihood that the

25           defendant will commit other crimes, an upward

1    departure is warranted."

2    Here, for the reasons that will follow, I find that

3    the defendant's criminal history in this case substantially

4    under-represents the likelihood that the defendant will commit

5    other crimes.

6    By way of background, I note a conviction on August

7    26, 1978 for carrying a concealed weapon.  A conviction on June

8    25, 1980 for aggravated menacing.  A conviction on October 28,

9    1981, for abduction.  A conviction on July 10, 1990 for

10   burglary in Cuyahoga County, Ohio, Court of Common Pleas.  In

11   connection with that matter, I note that, per the presentence

12   report, the sentence of imprisonment was suspended by the

13   court, that day the defendant was placed on three years

14   probation.  The probation officer goes on to note that "the

15   records reflect that a warrant was subsequently issued for the

16   defendant's arrest by the court on July 18, 1991, due to the

17   fact that he had absconded from probation supervision and had

18   not reported to his probation officer since April of 1991."

19   The probation officer went on to note that the defendant

20   remained a fugitive from that case until his arrest and

21   incarceration in San Diego, California, relative to an offense

22   for assault with a deadly weapon on January 1st -- excuse me,

23   January 5, 1992.

24   The probation officer notes that the records

25   revealed that the defendant's probation was revoked on four

1  separate occasions.  February 25, 1992; April 23, 1992; July

2  30, 1993; and July 12, 1994, "indicating a pattern of

3  noncompliance."

4          On June 5, 1993, conviction for obstructing or

5  resisting a public officer.  Relative to that conviction, the

6  defendant pled guilty to the offense and was sentenced to 10

7  days in jail, placed on three years probation.  However, the

8  defendant subsequently violated the terms of his probation on

9  February 25, 1994, the court revoked his probation and issued a

10  warrant for his arrest.

11          On October 2, 1994, a conviction for assault with a

12  deadly weapon.  For which he served something in the vicinity

13  of seven years.  He was paroled.  The defendant was last

14  paroled on November 29, 2004.  And on January 5, 2005, a parole

15  violation warrant was issued for his arrest, as he once again

16  had absconded from supervision.

17          Finally, on March 28, 2005, he was arrested by the

18  Warren, Pennsylvania State Police on a fugitive warrant and

19  incarcerated in the Warren County Jail.

20          In short, his tendency to consistently recidivate is

21  amply born out by the record.  This, in my view, if there is

22  such a thing, this is not run of the mill recidivism, this is

23  major league recidivism.  Not only has he consistently, and I

24  underline consistently, committed crimes since he was 19, but

25  in large measure, as reflected by the information in the

40

1  probation officer's report, he has been uncontrollable on

2  probation and violated probation on numerous occasions.

3           Now, under 4A1.3(4)(a), styled determination of

4  extent of upward departure, the following appears.  "Accept as

5  provided in subdivision (B), the court shall determine the

6  extent of a departure under this subsection by using as a

7  reference the criminal history category applicable to

8  defendant's.  This criminal history or likelihood to recidivate

9  most closely resembles that of the defendant's."

10           In this case in looking at the criminal history

11  categories of V or VI, it is, in my view, criminal history

12  category V is inadequate in this case, given the previously

13  described number of times and the pattern of recidivistic

14  behavior on the part of the defendant.

15           Consequently, I find, consistent with (4)(a), that

16  the appropriate criminal history category in this case is a VI,

17  with the following result.  Total offense level of 17.

18  Criminal history category of VI.  Generates a guideline

19  provision of 51 to 63 months.  In all other respects the

20  findings I previously made on the record relative to the

21  statute and guideline ranges would be the same.  All right,

22  Mr. Patton.

23           MR. PATTON:  Your Honor, I would submit that having

24  departed upward two criminal history categories, that a

25  sentence at the bottom of that range would be sufficient, but

1    not greater than necessary, to punish Mr. Lewis and to promote

2    respect for the law.  And to protect the public, and to avoid

3    unwarranted sentencing disparities.  That is a pretty large

4    departure, so I would submit that a sentence of 51 months would

5    be sufficient, but not greater than necessary, to achieve those

6    purposes.

7              Mr. Lewis does have a history of committing

8    offenses.  This offense is not a violent offense.  The Third

9    Circuit and every other circuit have found that possession of a

10   firearm by a prohibited person is not itself a crime of

11   violence.  The weapon was not used in any way.  And it has

12   never been reported stolen.  It's never been shown that

13   anything other than what Mr. Lewis said as to how he came into

14   possession of the gun is the truth.  He possessed the gun for a

15   matter of less than an hour, it seems from all of the facts

16   testified to at the suppression hearing.

17             He was kept in the Erie County Prison for a very

18   lengthy time after the court ordered him for a mental health

19   evaluation.  We litigated through the papers at length on the

20   speedy trial issue.  I understand your Honor found there was no

21   speedy trial issue, but he did sit there for a long time.

22             He is a man that has mental health problems.  I

23   understand Springfield said that there was malingering, the

24   records show that.  But anybody who sits down and spends any

25   period of time interacting with Mr. Lewis, will have to

1  conclude that he just does not have the same mental capacities
2  as the ordinary person.  And I submit that that has had a lot
3  to do with his problems with complying with probation and
4  parole.  I think Dr. Ryan characterized it best in his report
5  when he talked about Barry just has a really hard time keeping
6  two separate ideas in his mind at the same time.  And being
7  able to understand I'm on supervision with these conditions and
8  I want to do this and then be able to compare those two and say
9  this violates my conditions.  Barry is not able to engage in
10 that type of thinking, he just isn't.  We have had the same
11 conversations about the same legal concepts, five, six, seven
12 times, and it's just, it's not his fault, I'm not expressing
13 any frustration on my part in dealing with him, because I truly
14 believe he just has a limited mental capacity.  And I would
15 submit to you that a 51 month sentence is sufficient, followed
16 by a term of supervised release and that will be adequate.
17         Mr. Lewis previously sent a letter to your Honor,
18 I've discussed that fact with Mr. Lewis, I'm sure your Honor
19 has read it, and he would just like to rely on his letter to
20 your Honor for his right of allocution.
21         THE COURT:  All right, let me just confirm that.
22 Mr. Lewis, you understand that you do have the right to speak
23 at this time at your sentencing and tell me anything you think
24 is important.  But it is my understanding you don't want to do
25 so and you're satisfied with what you wrote me?

43

1             THE DEFENDANT:  Yes, sir.

2             THE COURT:  All right.  Ms. Sanner.

3             MS. SANNER:  Your Honor, for all of the reasons

4 previously stated, the government is requesting a sentence at

5 the high end of the range.  As to Mr. Lewis's mental health

6 problems, the government notes that Dr. Ryan expressed his

7 opinion with less than the usual degree of certainty in

8 believing that Mr. Lewis may have been malingering.  The second

9 psychiatrist reported that he was indeed malingering and she

10 told me that he improved almost immediately upon his arrival at

11 the facility upon the understanding that he could be

12 incarcerated indefinitely while he maintained or regained his

13 ability towards competency.

14             The government persists in its view that this court

15 has mistakenly conflated the issues of occupied structure under

16 Taylor with likely presence under the Ohio burglary statute.

17 And for that reason the government truly believes that the

18 appropriate range is 15 years minimum.  Therefore, the

19 government is requesting a sentence at the high end of the

20 range.

21             THE COURT:  All right.  In fashioning a sentence, in

22 addition to considering the advisory guideline range, I must

23 also consider the other factors that are set forth in 3553(a),

24 which requires the court to impose a sentence that is

25 "sufficient, but not greater than necessary" to comply with the

1  purposes that are set forth in paragraph two.  Paragraph two
2  indicates that such purposes are:
3          (A) to reflect the seriousness of the offense, to
4          promote respect for the law, and to provide just
5          punishment for the offense;
6          (B) to afford deterrence to criminal conduct;
7          (C) to protect the public from further crimes of the
8  defendant; and
9          (D) to provide the defendant with needed educational
10 or vocational training, medical care, or other correctional
11 treatment in the most effective manner.
12         Section 3553(a) further directs the sentencing
13 courts to consider; (1) the nature and circumstances of the
14 offense and the history and characteristics of the defendant;
15 the kinds of sentences available; the need to avoid unwanted
16 sentencing disparities among defendants with similar records
17 who have been found guilty of similar conduct; and the need to
18 provide restitution to any victims of the offense.
19         In my view the crime here, that is the possession by
20 a felon of a firearm, is a serious one.  There obviously are
21 very good reasons why convicted felons should not possess
22 firearms.
23         As I discussed more fully in connection with the
24 government's motion for an upward departure, the defendant does
25 have a long criminal history, some of which is of a violent

1    nature.  And he also has a history, as I had indicated, of a
2    failure to comply with parole conditions that had been set from
3    time to time.

4    In addition, as has been discussed extensively here
5    during the sentencing hearing, there is a significant mental
6    health history going back it appears at least to the early
7    '90s.  And to a certain extent it appears to be all over the
8    park.  There has been a diagnosis of schizophrenia, organic
9    personality disorder, psychotic disorder and, yet, there have
10   also been findings by the psychologists or psychiatrists that
11   in certain particulars the defendant was exaggerating his
12   symptoms or malingering.  In any event, it's clear to me that
13   however they are characterized, there are significant mental
14   health issues afoot here that in all likelihood remain in play.

15   In fashioning a sentence in this case, in my view
16   the protection of the public is a significant sentencing
17   consideration in light of his background.

18   In addition, deterrence of others, that is other
19   individuals who may have been convicted of a crime and would be
20   weighing whether the possession of a firearm was worth the
21   gamble, I think deterrence to that extent is legitimate.

22   And in fashioning a sentence here, I have also
23   specifically considered the need to avoid unwanted sentencing
24   disparities.  So I've considered all these factors in imposing
25   the sentence which I'm about to do.  Mr. Lewis, would you stand

1   up, please.

2           Pursuant to the Sentencing Reform Act of 1984, it is

3   the judgment of the court that the defendant, Barry Wayne

4   Lewis, is hereby committed to the custody of the Bureau of

5   Prisons to be imprisoned for a term of 57 months.

6           Upon release from imprisonment, the defendant shall

7   be placed on supervised release for a term of three years.

8           Within 72 hours of release from the custody of the

9   Bureau of Prisons, the defendant shall report in person to the

10  Probation Office in the district to which the defendant is

11  released.

12          While on supervised release, the defendant shall not

13  commit another federal, state or local crime, shall comply with

14  the standard conditions of supervision recommended by the

15  Sentencing Commission and adopted by this court, and shall

16  comply with the following additional conditions:

17          The defendant shall not illegally possess a

18  controlled substance.

19          The defendant shall not possess a firearm,

20  ammunition, destructive device or any other dangerous weapon.

21          The defendant shall participate in a program of

22  testing and, if necessary, treatment for substance abuse as

23  directed by the probation officer, until such time as the

24  defendant is released from the program by the probation

25  officer.

1    Further, the defendant shall be required to
2 contribute to the costs of services for any such treatment in
3 an amount determined by the probation officer, but not to
4 exceed the actual cost.

5    The defendant shall submit to one drug urinalysis
6 within 15 days after being placed on supervision and at least
7 two periodic tests thereafter.

8    The defendant shall participate in an alcohol after
9 care treatment program approved by the probation officer, which
10 may include urine tests.

11    The defendant shall participate in a mental health
12 treatment program approved by the probation officer, until such
13 time as the defendant is released from the program by the
14 probation officer.

15    The defendant shall cooperate in the collection of
16 DNA as directed by the probation officer.

17    It is further ordered that the defendant shall pay
18 to the United States a special assessment of $100, which shall
19 be paid to the United States District Court Clerk forthwith.

20    I find that the defendant does not have the ability
21 to pay a fine, consequently, I will waive a fine in this case.

22    Mr. Lewis, do you understand that you have the right
23 to appeal the sentence which I've imposed here today --

24    THE DEFENDANT:  Yes, your Honor.

25    THE COURT:  Wait, I'm not done.  But if you choose

1    to do so, you must do so within 10 days, do you understand

2    that?

3              THE DEFENDANT:  Yes, your Honor.

4              THE COURT:  All right, we're adjourned.

5

6              (Whereupon, the Sentencing proceedings concluded

7    at 11:38 a.m.)

8

9                                    - - -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## <u>C E R T I F I C A T E</u>

1

2

3

4

5     I, Ronald J. Bench, certify that the foregoing is a

6 correct transcript from the record of proceedings in the

7 above-entitled matter.

8

9

10

11 _____

12 Ronald J. Bench

13

14

15

16

17

18

19

20

21

22

23

24

25